suit and consequently, that plaintiff is not entitled to a refund of the taxes paid as a result of the disallowance of the deductions.

IT IS THEREFORE ORDERED, that the defendant's motion for summary judgment is granted as to all issues in suit, except that plaintiff is entitled, as defendant concedes, to an additional tax deduction for the costs incurred in this action, including reasonable attorney's fees. With that exception, plaintiff's motion for summary judgment is denied. Accordingly, the case is remanded to the trial division for a determination of such additional deductions and the amount of the tax refund to which plaintiff is entitled on account thereof.

David H. MILLER and Kenneth W. Miller

v.

The UNITED STATES.

No. 59–71.

United States Court of Claims.

Feb. 23, 1977.

A. D. Freeman, Jr., New Orleans, La., attorney of record, for plaintiffs.

Gerald L. Schrader and Alexander Younger, Washington, D.C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D.C., for defendant.

Before SKELTON, NICHOLS and KUNZIG, Judges.

## ON DEFENDANT'S EXCEPTIONS TO TRIAL JUDGE'S OPINION

KUNZIG, Judge:

This suit is based on a contract between plaintiff-Miller Brothers (Miller)[1] and defendant-United States Department of Housing and Urban Development (HUD) for the servicing of mobile homes in Plaquemines Parish,[2] Louisiana. Plaintiff claims that the Government improperly withheld money due under the contract. Defendant counterclaims, stating (1) that it overpaid on sums already remitted to plaintiff, (2) that Miller's claim is forfeit due to fraud,[3] and (3) that Miller, in the course of performing the contract, violated the False Claims Act.[4] The Government further requests the statutory penalty of $2,000.00 for sixteen alleged violations of the Act.

---

1. Throughout the opinion "Miller" is used to stand for the Miller brothers' partnership. This description not only recognizes that David Miller alone administered the contract, but also takes into account the basic partnership law principle that acts of one partner bind the partnership. H. Ballantine, Ballantine on Corporations, 7 (1946).

2. A Parish is a jurisdictional and political subdivision in Louisiana, corresponding to counties in other states of the Union.

3. 28 U.S.C. § 2514 (1970), which provides:

    A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

    In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

4. *United States v. Bornstein*, 423 U.S. 303, 305–07 n. 1, 96 S.Ct. 523, 526–527, 46 L.Ed.2d 514 (1976), which states:

    The False Claims Act was adopted in 1863. Act of Mar. 2, 1863, c. 67, 12 Stat. 696. It was re-enacted as Rev.Stat. §§ 3490–3494, 5438. The part of the Act dealing with civil prohibitions is now codified in 31 U.S.C. § 231 *et seq.* The language used in Title 31 differs in some important respects from that contained in the Revised Statutes. Since Title 31 has not been enacted into positive law, the official text of the statute is that which appears in the Revised Statutes. See *United States v. Neifert-White Co.,* 390 U.S. 228, 228–229, n. 1, 88 S.Ct. 959, 19 L.Ed.2d 1061; *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 539–540, and n. 2, 63 S.Ct. 379, 87 L.Ed. 443.

    The relevant statutory provisions are as follows:

    § 3490. "Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall do or commit any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight, Title 'CRIMES,' shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit."

    § 5438. "Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any

After thorough examination of the testimony at trial, the documents submitted by the parties, and all briefs filed by counsel, we hold that Miller is entitled to recover in part. The amount is reduced, however, by the Government's False Claims Act counterclaim, which we find meritorious, again in part. As to the remaining two counterclaims, the Government appears to have abandoned its claim for overpayment, so we do not consider it. The fraud claim, we deny.

In reaching our decision, we have determined that the Trial Judge's recommended findings of fact do not merit the normal presumption of correctness under Ct.Cl. Rule 147(b), and thereby substitute our own. We do this only with great difficulty upon being convinced by a thorough analysis of the complete record that the Trial Judge misconstrued the evidence submitted in this case. *See Ricci v. United States,* 507 F.2d 1390, 1392, 205 Ct.Cl. 687, 697–98 (1974); *Willett v. United States,* 406 F.2d 1346, 1353, 186 Ct.Cl. 775, 787–88 (1969); *Miller v. United States,* 339 F.2d 661, 662, 168 Ct.Cl. 498, 501 (1964).

person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, or who, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, who, with intent to defraud the United States or willfully to conceal such money or other property, delivers or causes to be delivered, to any other person having authority to receive the same, any amount of such money or other property less than that for which he received a certificate or took a receipt, and every person authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammu-

## Facts

The facts of this case are complicated and require thorough elaboration. We begin with the incredible devastation wrought on Placquemines Parish, where Hurricane Camille struck this southeastern part of Louisiana on August 17, 1969. Virtually surrounded by water (three sides by the Gulf of Mexico and split lengthwise by the Mississippi River), the Parish was inundated. Wind, water and tornado combined to destroy virtually 100% of all homes. The communities of Venice, Boothville, Triumph and Pilottown were completely ruined. Buras and Empire were 80% and 60% lost.

As a result, the Parish was declared a major disaster area by the Federal Government on August 19, 1969.[5] As part of Government relief to the Parish, the Emergency Preparedness Administration made funds available to furnish housing for Hurricane Camille's victims—some 15,000 homeless evacuees. With these funds, HUD began a program to provide temporary housing in mobile homes, arranging with a private contractor to bring in and set up HUD-leased mobile dwellings through-

nition, provisions, clothing, or other property so used or to be used, who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, and every person who knowingly purchases or receives in pledge for any obligation or indebtedness from any soldier, officer, sailor, or other person called into or employed in the military or naval service any arms, equipments, ammunition, clothes, military stores, or other public property, such soldier, sailor, officer, or other person not having the lawful right to pledge or sell the same, every person so offending in any of the matters set forth in this section shall be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars."

Section 5438 was repealed in 1909. Act of Mar. 4, 1909, c. 321, § 341, 35 Stat. 1153. It has continued vitality only insofar as it specifies the acts giving rise to civil liability under § 3490. *See United States v. Neifert-White Co., supra.* The criminal prohibitions were subsequently altered and codified in 18 U.S.C. §§ 287 and 1001.

5. 34 Fed.Reg. 13770 (1969).

out the Parish. In total, approximately 1,800 trailers were moved in to provide disaster relief housing.

From its inception until December 1969, when the last victims of the disaster were assigned trailers, the Emergency Relief Housing Program was administered by regular HUD employees from Houston and Fort Worth, Texas. After the regular HUD employees withdrew, the program was administered by Parish employees hired by HUD on a temporary basis. Kermit Ballay and Peter Turlich, both longtime Parish employees, were designated as Housing Manager and Assistant Housing Manager, charged with administering the housing program at the local level for HUD.

In December 1969, HUD issued an advertised competitive solicitation (VC–1–70) for repair and preventive maintenance on the approximately 1,800 mobile homes in the Hurricane Camille Disaster Area for the period December 23, 1969 or date of award (whichever was later) through August 18, 1970. The Miller brothers, as a partnership, were awarded the contract effective January 30, 1970.

The agreement contained provisions making the Service Contract Act, 41 U.S.C. § 351 et seq. (1970), applicable. That Act requires the contractor to meet minimum wage standards and to maintain specified employment records. In addition, special provisions of the contract required Miller to use only new parts and materials or rebuild parts with prior Government approval. Further, the contractor agreed to perform all work with competent mechanics, experienced and qualified to work on the specified equipment.

The contract provided that Miller would make periodic inspections of the mobile homes to check, clean and adjust all equipment including plumbing, heating, electrical systems and furniture furnished with the mobile homes. During such inspection, the contractor would also check the level of the trailer, re-level as required, and make any other needed repairs or replacements subject to a $50.00 cost limitation.

The contract also called for Miller to make service calls on the mobile homes at the direction of the Housing Manager. Service calls were to include, but were not limited to, repair or replacement of mechanical equipment, plumbing, electrical equipment, wiring and household fixtures, and appliances covered under the HUD mobile home lease. Also included in service calls were repairs to carpentry, sheet metal, painting, floor covering and roofing items. Each call was to be made within ten hours after notification. Service call costs, including labor and materials, were limited to $50.00. Service calls exceeding $50.00 required the prior approval of the Housing Manager or his assistant.

The Housing Manager, Ballay, and his assistant, Turlich, were authorized by the contract to administer its provisions on behalf of the Contracting Officer, Leonard E. Church, HUD Deputy Regional Administrator in Fort Worth, Texas. The authorization did not, however, allow Ballay, the Housing Manager, to modify any contract terms or specifications.

Performance under the contract began on January 31, 1970. Miller assigned workmen to make the periodic inspections. Not one of these workmen was qualified to make repairs. At the outset, this situation was not a problem, even though the contract specified that certain repairs were to be made in conjunction with periodic inspections. Mr. Ballay, it appears, initially instructed Miller *not* to make repairs during inspection visits. It should be noted that Mr. Ballay was without authority to alter the contract in this regard. In March or April of 1970, Mr. Ballay changed his instructions to conform to the contract.

Service calls were made by David Miller or one of his workmen upon receipt of a complaint form from the HUD Housing Office in Buras. HUD trailer tenants phoned in complaints to that office, where a complaint form was prepared. Miller picked up the forms daily from the Housing Office and distributed them to his workmen for action. The workmen supposedly made the

requested repairs and listed the work done, materials used, and time expended.

The complaint forms were then returned to Miller's trailer office where Sally Miller, David Miller's wife, prepared an invoice for HUD. Mrs. Miller supplied the cost of materials on the HUD invoice by looking up the cost of the material in a purchase book in which all purchases were supposedly recorded.

Miller made continuing purchases of contract materials at varying prices, but maintained no inventory program. Thus Mrs. Miller had no way of knowing, when she prepared invoices for HUD, which of varying priced materials Miller's workmen had used on a particular service call. Consequently, on almost any invoice, it was possible for Mrs. Miller to charge defendant incorrectly.

For service calls costing in excess of $50.00 in labor and materials, the contract required Miller to secure the Housing Manager's, or his assistant's, approval before making the repairs. Approval was obtained by Miller telephoning the HUD Housing Office and receiving an "oral OK." Later Ballay and Turlich would review Miller's invoices, rejecting those over $50.00 for which neither HUD agent could remember granting approval. Over the course of the contract, 36 invoices were summarily rejected.

For the period of contract performance, January 31, 1970 through the June 10, 1970 termination date, Miller submitted five consolidated billings—one for each month of performance. In preparing each of the final billings, Miller submitted all invoices for the month to the HUD Housing Office in Buras. Mr. Ballay again looked over the invoices, and after discussion with David Miller, rejected still more invoices about which he had doubt. The remainder were totaled and submitted to HUD for payment.

The amounts submitted by Miller, approved by Ballay, and paid (or remaining unpaid) by the United States are as follows:

| | Submitted by Miller | Approved by Ballay | Paid by U.S. |
|---|---|---|---|
| Jan. 31–Feb. 26, 1970 | $9,156.82 | $8,163.89 | $8,163.89 |
| Feb. 27–Mar. 31, 1970 | 20,193.36 | 13,555.16 | — |
| Apr. 1–Apr. 29, 1970 | 8,101.36 | 8,041.18 | — |
| Apr. 30–May 31, 1970 | 16,974.12 | 7,490.20 | — |
| June 1–June 10, 1970 | 2,019.69 | 1,782.31 | — |
| | $56,445.35 | $39,032.74 | |
| | –8,163.89 | –8,163.89 | $8,163.89 |
| Unpaid | $48,281.46 | $30,868.85 | |

No payments were made after the initial $8,163.89 because the local HUD officials became suspicious of possible irregularities in Miller's operation. The Assistant Housing Manager, Mr. Turlich, found several instances where work, listed as completed on invoices, had not been done. Mr. Turlich reported his findings on "materials billed but not furnished" to Mr. Ballay, who in turn relayed the information up the chain of command to the Contracting Officer (CO), Mr. Church.

Mr. Church ordered a study of the situation in Plaquemines Parish. Bruce Gipson, a HUD maintenance engineer (and a registered professional engineer in the State of Texas) was assigned to make the study. Mr. Gipson found that Miller did not keep payroll records or tallies of Social Security and Federal income tax withholdings as required by the Service Contract Act. In addition, while spot-checking invoices, Gipson discovered a number of instances where Miller had billed the Government not only for materials not furnished and work not done, but also billed for both a periodic inspection and a service call when only a periodic inspection billing was justified.

Mr. Gipson reported the results of his inquiry to the CO and recommended that Miller be investigated for possible fraudulent billings and that the contract be terminated. Based upon Gipson's report, the CO, by letter of May 28, 1970, notified Miller that the contract was terminated as of June 10, 1970. Miller does not dispute the termination.

Following termination of the contract, Miller was made the subject of a special HUD audit. Due to the chaotic (and sometimes non-existent) nature of Miller's

records, this thorough audit took more than twice as long as the average HUD audit of this type—a total of 50 man-days. Upon conclusion of the audit, the HUD auditors determined (disallowing certain charges) that Miller had unpaid billings of $46,-111.64. From this amount must be subtracted $8,163.89, already paid by defendant, leaving a final figure of $37,947.75 in unpaid billings.

Since the Government still withheld payment, Miller sued on February 26, 1971, for breach of contract in this court. Plaintiff alleged that he is due the difference between the unpaid billings ($56,445.35 by his calculation) and the one contract payment ($8,163.89) or $48,281.46.[6]

Defendant counters, arguing that, due to fraudulent billing, Miller's claim is totally forfeit under 28 U.S.C. § 2514 (1970). In addition, the Government seeks penalties from Miller for 16 alleged violations of the False Claims Act, *supra,* note 4.

We hold that Miller is entitled to recover in part,—$46,111.64 (the auditors' figure), less the contract payment of $8,163.89, minus $10,000.00 for five violations of the False Claims Act, or $27,947.75. We deny the Government's remaining counterclaim that Miller's suit be totally forfeit because of fraudulent billings.

### Entitlement Under the Contract

Miller's right to recover is based on a breach of contract theory. The Government entered into an agreement with Miller. Miller was to provide services; the Government was to pay. The contract provides that, in the event of termination, the Government is *liable for services rendered to it "prior to the effective date of termina-*

tion." *Cf. Acme Process Equipment Co. v. United States,* 347 F.2d 509, 530, 171 Ct.Cl. 324, 359 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Therefore, absent compelling reason to the contrary, Miller should be entitled to recover at least to that extent.

### Fraud Counterclaim

However, the Government contends that Miller's own actions furnish compelling reasons for denying his claim; that his conduct was fraudulent and his claim should be forfeited. Yet fraud, resulting in forfeiture, can be found only on the basis of clear and convincing evidence. *Chelsea Factors, Inc. v. United States,* 181 F.Supp. 685, 691, 149 Ct.Cl. 202, 212 (1960). An intent to deceive the Government must be proved. *Bar-Ray Products, Inc. v. United States,* 340 F.2d 343, 351 n. 14, 16 Ct.Cl. 839, 851 n. 14 (1964).

In the instant case, after careful analysis of the record, we find the evidence clear and convincing not of fraud, but of negligence and ineptitude. Plaintiff's failure to keep an inventory, his lack of payroll records (both discussed *supra* ), and confused and incorrect invoices [7] resulting from slipshod supervision of the workmen [8] combine to form a pattern of carelessness and slothfulness. But, in analyzing the alleged fraud, we must add to Miller's difficulties, problems brought about by the Government: The local HUD official's orders not to perform any repairs during periodic inspections (contra to the contract), failure to maintain records of when this order was changed and HUD's slipshod method of approving expenses in excess of $50.00 "only when it was remembered." [9] Taken togeth-

---

6. *See supra,* page 21.

7. These billings include such items as a faucet that plaintiff never installed but charged the Government for, a used sofa and chair installed when new material was required under the contract, and a used commode taken from a burned-out trailer, installed in a different trailer and billed to the Government as new.

8. While David Miller testified that he "always checked" his men's work personally, in view of

his other testimony—that he made frequent trips to New Orleans (a ride of several hours) and other surrounding towns to purchase materials and make repairs—it would appear that supervision was lax.

9. Yet another problem was the Government's failure to preserve evidence to prove its case. Two HUD officials placed an X mark on a perfectly operating oven control valve, then placed a repair order. Later, after Miller submitted an invoice stating that the valve had

er, we think that the total effect of the activities surrounding the execution of this contract falls outside the scope of fraud.

It is a close question, and the line is hard to draw, but we come down on the side of ineptitude as against a blatant intent to deceive. The Government's counterclaim in fraud is thereby denied and plaintiff's claim is not forfeited *per se.*

### False Claims Act Counterclaim

█ The Government contends that Miller owes the statutory penalty of $2,000.00 for each of eleven invoices used in calculating monthly consolidated billings *and* $2,000.00 for each of the five consolidated billings submitted by Miller for a total penalty of $32,000.00 (16 × $2,000.00). The Government bases its contention that Miller knew of the false claims upon testimony given by Miller that he "always checked" his men's work. As we stated above, *see supra* note 8, we do not think it possible that Miller could have so closely supervised the workmen.

The False Claims Act imposes a penalty on a person who:

> . . . presents . . . for payment . . . any claim upon or against the Government . . . *knowing* such claim to be false . . . . *(supra,* note 4). (emphasis supplied)

The Eighth Circuit has held that "negligent representation" of a claim falls within the "knowledge" requirement of the Act. *United States v. Cooperative Grain & Supply Co.,* 476 F.2d 47, 60 (8th Cir. 1973); Annot. 26 A.L.R.Fed. 307 (1976).

To use just one of many possible examples, Miller testified that he knew the quantities of materials billed by his workmen were only estimates of what had actually been used. But he did not bother to check his inventory; in fact, he failed to maintain

any inventory control. As the auditors determined, the result of this extreme negligence was that the Government was substantially overbilled due to misrepresentation of the amount of materials actually used. Such conduct by Miller is within the scope of that proscribed in *Cooperative Grain, supra.*

In addition, Miller cannot escape liability by alleging that he relied on the local HUD official's assistance in preparation of the consolidated billings. Regardless of who actually summarized the individual tally of invoices for submission to the Government for payment, Miller, as the applicant, had the responsibility to make correct representations. *Cooperative Grain, supra,* 476 F.2d at 60. If this alone were not enough, Miller also signed each consolidated billing, evidencing his agreement to the figures it contained.

Upon a thorough examination of Miller's operations under the contract, as illustrated by the record, we hold that the Government is entitled to recover under its False Claims Act counterclaim. We must now decide the extent of that recovery.[10]

What is involved is a determination of the number of false claims submitted in this case. The Government argues for sixteen—eleven based on invoices used in calculating the monthly billings plus five, one for each of the monthly consolidated billings.[11] This position is refuted by both the Act and appropriate case law.

The Act imposes a penalty for each *false claim submitted to the Government for payment. See supra* note 4. In the instant case, plaintiff submitted only five such claims—the five consolidated billings. The invoices for which the Government also seeks the statutory penalty were used in determining the total of each claim. In this

been changed, only one of the men returned to check the work, finding the X-marked valve still in place. Yet no records, written (aside from the invoice) or pictorial, were kept of this potentially damaging incident.

10. We note that the Government seeks only the $2,000.00 penalty, not double the amount of the

damages which is also allowed under the statute. *Supra,* note 4.

11. Penalizing for eleven invoices *plus* the five consolidations of the same eleven invoices seems clearly a miscarriage of justice. The Act never intended this form of double punishment.

regard, the invoices are like tally sheets used in calculating a final figure to present to the Government; they are not the claim itself.

In finding five, not sixteen, false claims, we agree with the Ninth Circuit decision in *United States v. Woodbury,* 359 F.2d 370 (1966). In *Woodbury,* the court held that separate penalties are not imposed based upon the number of false papers contained in a particular claim made upon the Government. 359 F.2d at 378. The court reasoned that each amount requested from the Government is a claim, so regardless of the number of false invoices that were used in arriving at each demand, only one penalty per demand is imposed. *Id.*

This position is supported by the recent Supreme Court case, *United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) [12] (which the Government seems to be citing in support of its own position). In *Bornstein,* the Court held that 21 boxes of falsely marked items sent in three separately invoiced shipments, constituted only three violations of the False Claims Act. If the Supreme Court were to have followed defendant's current rationale and applied it to *Bornstein,* it probably would have found 21 violations of the Act in *Bornstein.* The Court did not so hold.

In fact, the defendant's argument before this court seems more in line with Justice Rehnquist's dissent in *Bornstein* than with the majority opinion. It is the position of the dissent (and the Government in the instant case) that, based upon the facts of a particular case, each false item used in reaching a final figure which is then submitted for payment could be a violation of the Act. We reject this reasoning.

As the court holds only five false claims were submitted, we need not examine the alleged falsity of each of the eleven invoices upon which part of the Government's counterclaim is based. Rather we need only find that some part of each consolidated billing was false. This we find upon an examination of the auditor's report.

The audit showed that Miller billed the Government at prices exceeding costs for each of four chief materials used in performing the contract. The materials overbilled were stove control valves (billed at $18.12 instead of cost, $13.96, a total overcharge of $212.16), roof coating (billed at $5.23 per gallon instead of $4.95 per gallon, an overcharge of $99.68), sewer pipe (billed at $1.09 per linear foot instead of $.39, a total overcharge of $1,573.60), and window glass (a total overcharge of $502.91). These excessive charges continued over the life of the contract and were reflected in each consolidated billing. For these overcharges and other false billings, Miller must pay $2,000.00 for each of the five times he sought Government payment—a total of $10,000.00.

We hold that plaintiff has clearly violated the False Claims Act and is subject to its penalties.

*Quantum*

■ Up to this point, we have decided that Miller is entitled to recover under the contract, that his claim is not forfeit for fraud, and that he is liable for a $10,000.00 penalty under the False Claims Act. One issue remains, that of the amount due Miller under the contract for services rendered prior to termination. It is only upon calculation of this amount, owed in accordance with the payment provisions of the contract, that the case can be finally concluded.

Although the Trial Judge appeared, in her opinion, to reserve the determination of quantum for later proceedings, we will consider the matter at this time. There was no stipulation by the parties to hold determination of amount until a later time. Ct.Cl. Rule 131. Further, an examination of the record reveals sufficient evidence upon which to compute the amount due plaintiff.

---

12. We note that the Supreme Court cites *United States v. Woodbury,* 359 F.2d 370 (1966) (upon which we rely) with approval for the proposition that the number of false claims is determined by the number of demands the contractor has made upon the Government. *United States v. Bornstein,* 423 U.S. 303, 309 n. 4, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

The evidence submitted at trial affords three possible ways of calculating the amount due Miller. The first is by using the consolidated billings submitted by Miller to the HUD authorities in Buras, Louisiana. (A total of $56,445.35 minus $8,163.89 already paid, or $48,281.46.) [13] This method is unacceptable. These figures were disputed not only by the local HUD managers, but also by the special HUD audit team that carefully examined Miller's books. In addition, giving Miller all that he requests would belie our decision that Miller substantially overbilled the Government.

The second possible manner of arriving at an amount due Miller is by taking the total of the consolidated billings prepared by Miller in conjunction with the local HUD authorities. The sum of the five consolidated billings, $39,032.74, reflects the examination and reduction by Ballay, the HUD Housing Manager, of Miller's original submission discussed above. Subtracting from this amount the $8,163.89 already paid to Miller by HUD leaves $30,868.85 owing.[14]

As with the figures originally submitted by Miller, this total is also unacceptable. While the local HUD officials made a good faith effort to scrutinize the invoices submitted by Miller, neither official is a trained accountant. Their methods are not available for review. From what information is available, it is obvious that the rejection of some invoices was done on an *ad hoc* basis from memory alone. We cannot base our determination on such procedures and also reject this method.

The final ground upon which to rest assessment of quantum is the official HUD audit report. The audit was performed by a special team sent to Buras by the Regional HUD Office. The auditors, Allen Cash and William York, each spent approximately 25 man-days examining Miller's records. During this time, Miller had ample opportunity to urge his calculations on the auditors. Their report, based upon sound accounting principles and subject to verification through examination of the evidence sub-

mitted to the court, provides the best method of determining the amount properly due Miller under the contract. It is not clear that further proceedings are a lengthy new trial on quantum in the instant case would materially add to the facts already available.

This final total audit figure of $46,111.64 reflects analysis and examination by the auditors. It is lower than plaintiff's demand, yet higher than HUD's earlier *ad hoc* figure. Subtracting from this amount the $8,163.89 already paid to Miller leaves $37,947.75 owing. We hold that this is the final figure of unpaid billings.

However, because we have already decided that Miller must pay a $2,000.00 penalty for each of five false consolidated billings submitted to the Government, the $37,947.75 must be further reduced by $10,000.00 in order to arrive at the final sum owed Miller—$27,947.75.

In summary, upon examination of the briefs and after an exhaustive review of the evidence submitted in this case, we have determined that the Government did improperly withhold money under a contract with plaintiff for the servicing of mobile homes in Plaquemines Parish, Louisiana. We hold that Miller is entitled to recover $37,947.75 under the contract and that his claim is not forfeit due to fraud. The court also holds that defendant is entitled to recover $10,000.00 on its False Claims Act counterclaim. Plaintiff's ultimate recovery, therefore, is $27,947.75.

---

**13.** *See supra*, page 21.　　　　**14.** *Id.*