**CHEMRAY COATINGS CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1364C.**

United States Court of Federal Claims.

Sept. 16, 1993.

Marla J. Moss, West Orange, NJ, for plaintiff.

Gerald M. Alexander, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant.

## OPINION

NETTESHEIM, Judge.

This case, before the court after argument on cross-motions for summary judgment, involves claims arising from a contract terminated for convenience of the United States. Defendant asserts four counterclaims based on the False Claims Act, 31 U.S.C. § 3729 (1988); the Contract Disputes Act, 41 U.S.C. § 604 (1988); and 28 U.S.C. § 2514 (1988), providing for a special plea in fraud. Defendant charges that plaintiff fraudulently submitted false invoices for payment and knowingly made false representations in certified claims submitted to the contracting officer. Defendant asks the court to award the Government monetary relief totalling at least $348,498.00 including treble damages, civil penalties, and costs of this action. The Government also seeks the cost to the Government for disposing of the material in dispute, the unsupported amount of plaintiff's claims, and the forfeiture of all claims.

## FACTS

The following facts are largely undisputed, unless otherwise noted. Chemray Coatings Corporation ("plaintiff") is a paint manufacturer located in Kenilworth, NJ. On November 4, 1986, the General Services Administration ("GSA") awarded plaintiff Contract No. GS–10F–50646 to supply military camouflage paint to the Department of the Army (the "Army"). The contract was a requirements contract with a starting date of February 1, 1987. Plaintiff previously had submitted to the Army for approval its formulation for one of the paints called for by the contract, Forest Green Type II, and following inspection the formulation was accepted onto the Qualified Products List ("QPL") on February 8, 1984. GSA informed plaintiff during this submittal process that QPL standards prohibited changes in the formulation of the

paint unless a sample of the new formulation was submitted for retesting.

The contract contained a section entitled "Clauses Incorporated by Reference." This section specifically incorporated Federal Acquisition Regulation ("FAR") 48 C.F.R. § 52.210–5 (1987), which provides, in pertinent part:

Unless this contract specifies otherwise, the contractor represents that the supplies and components, . . ., are new, *including recycled (not used or reconditioned)* and are not of such age or so deteriorated as to impair their usefulness or safety. If the Contractor believes that furnishing used or reconditioned supplies or components will be in the Government's interests, the Contractor shall so notify the Contracting Officer in writing. The Contractor's notice shall include the reasons for the request along with a proposal for any consideration to the Government if the Contracting Officer authorizes the use of used or reconditioned supplies or components.

FAR § 52.210–5 (emphasis added).

GSA terminated the contract for convenience on October 14, 1987. Plaintiff received $715,544.40 in compensation for the paint supplied up to the time of termination. Following termination, plaintiff submitted a claim to GSA on January 13, 1989, for various costs connected with closing the contract, including unused materials. Officials of plaintiff and GSA met at GSA's Boston office on January 17, 1990, to discuss settlement of the termination for convenience. The testimony conflicts as to whether the condition of the materials for which plaintiff was claiming in the settlement was specifically discussed at the meeting.

On April 19, 1990, Contracting Officer Richard Bell issued a final decision approving the settlement reached by plaintiff and GSA. It states that "GSA performed a technical evaluation of the leftover inventory to ensure that only items and quantities necessary for completion of the terminated orders would be allowed." Defendant maintains that no inspection of the contents was undertaken at this time. The decision also determined that "[a]ll of the above costs [including the costs of the termination inventory] are allowable, reasonable and can be properly allocated to the termination action." On May 1, 1990, plaintiff submitted an invoice for the amount arrived at in the partial termination settlement agreement. On May 29, 1990, GSA issued a check to plaintiff for $97,065.00 in satisfaction of this agreement.

### 1. *The 10405 pigment claim*

The settlement agreement included reimbursement to plaintiff for the cost of 8,000 pounds of Irgacolor Green 10405 ("10405"), a green pigment manufactured by Drakenfeld Colors, a division of Ciba–Geigy, Inc. 10405 is the primary pigment used in the formulation of Forest Green Type II paint, one of the camouflage paints manufactured under the contract. On January 13, 1989, plaintiff submitted a certification to GSA claiming that the stock of 10405 was part of the contract's "termination inventory." In a second certification also dated January 13, 1989, plaintiff certified that the claimed costs were directly allocable to the terminated portion of the contract.

Plaintiff had purchased the 10405 pigment months prior to the formation of GSA contract. This stock of 10405 was present during a February 12, 1985 fire at plaintiff's warehouse, which damaged much of plaintiff's inventory of chemicals and materials. Since the fire destroyed the paper bags in which the 10405 had been packaged, the pigment was placed in 19 fiberboard drums. Work crews assigned to clean up the warehouse after the fire tried to recover the 10405 by shoveling it into cardboard drums. As a result, nails, wood chips, and other fire debris were mixed in with the 10405.

Plaintiff informed GSA that the stock of 10405 could not be returned to Ciba–Geigy because the bags in which the 10405 had originally been packaged had been ripped. GSA accordingly paid plaintiff $28,776.00 for the stock of 10405 pigment, calculated at a rate of $3.30 per pound, the market price for unadulterated 10405 pigment.

The parties dispute GSA's knowledge of the condition of the material in the drums. Defendant asserts that GSA did not know that the drums of 10405 contained fire debris. Instead, GSA first learned the drums did not contain unadulterated 10405 when they were transferred to Ciba–Geigy. Defendant asserts that upon receiving the drums, a representative of Ciba–Geigy contacted Contracting Officer Bell to inform him that the drums were contaminated. A letter dated October 24, 1990, from Ciba–Geigy Irgacolor Product Manager Dr. Gaudenz Furler to Mr. Bell noted that the drums contained burned wood, rusty nails, and other burned material. Mr. Bell informed plaintiff that the drums were unacceptable and demanded return of the amount paid for the drums. Plaintiff then filed suit in this court asking relief from GSA's reimbursement demand.

Several incidents conflict with defendant's account of the events preceding GSA's purchase of the 10405. A telephone contact record signed by Mr. Bell on June 15, 1990, notes that the Belle Meade Depot would receive the excess 10405 "and this would occur after the material was screened, if screening was deemed appropriate." [1] This note indicates some knowledge of the drums' contents well before that claimed by defendant and very close (two weeks) to the date of purchase. Three days later Mr. Bell recorded a conversation with Paul Legnetti of Ciba–Geigy in which 10405 green was described as non-hazardous. It appears from this record that Ciba–Geigy was contacted for information on disposing the 10405. An entry on the same document dated June 20, 1990, notes that during a telephone conversation a Mike Rugero advised that disposal costs for the 10405 would be "around $40,000 if material was hazardous." It does not appear that Mr. Bell intended to sell the material at this point. To the contrary, the records give the impression that Mr. Bell did not think the 10405 was saleable.

On June 19, 1990, Dr. Furler contacted Mr. Bell upon hearing that GSA was in possession of a quantity of 10405. Dr. Furler proposed to Mr. Bell that Ciba–Geigy "would accept the material for return less some money since the chemical was not in its original form and that they would have to repackage it in order to re-sell it." In response Mr. Bell sent a facsimile transmission dated September 25, 1990, indicating that "a quart sample of 10405 will be sent from the contractor [plaintiff] for your testing and the shipment of the remaining amount will be delayed until you have notified the Government that you are satisfied that the quality is acceptable." It is unclear whether this sample was ever shipped, but a shipping manifest dated October 10, 1990, shows shipment of 11,020 lbs. of 10405 to Ciba–Geigy.

Plaintiff claims that GSA knew the nature of the material that it purchased. Plaintiff has submitted an affidavit of its president, John Bilinski, in which Mr. Bilinski states that he told GSA officials that the material was in a fire, or, more precisely, that the bags had been broken after the fire and the materials were repackaged into drums for that reason. In addition, plaintiff submits the declaration of warehouse supervisor Roosevelt Harris that two Quality Assurance Specialists inspected the drums prior to conclusion of the settlement.

### 2. *The paint claim*

Plaintiff manufactured nine batches of Forest Green Type II paint for GSA under the contract. At least one batch of paint was manufactured using the 10405 from the drums, although it is not clear which of the nine batches this was. The exact formulation of these batches has been lost, since the "batch cards" recording this information were destroyed by plaintiff's personnel. Defendant speculates that since the batch manufactured with the 10405 from the drums was larger than average, it might have been batches 2671,

---

**1.** At oral argument defendant explained that "screening" in this context referred to the process by which GSA would search for a user for the material. It did not, as defendant claimed, refer to the screening process used by plaintiff to remove the fire debris.

2673, 2674, or 2675. GSA paid plaintiff $50,985.00 for Batch 2671, $57,777.00 for batch 2673, $45,248.00 for batch 2674, and $49,808.00 for batch 2675.

Plaintiff used a metal screen with ⅜–inch openings to sift the fire debris from the pigment before using it to make the paint. The paint made with the screened 10405 pigment passed GSA inspections and testing. Plaintiff did not reveal the source of the 10405 pigment to GSA during this process. Plaintiff's officers were aware that screened 10405 pigment was being used, and an officer signed certifications of conformity with QPL standards for each of the shipments of Forest Green Type II paint.

It is unclear from the record whether the material mixed in with the 10405 altered the material to an extent that it was no longer the same material approved in the QPL. Defendant, citing the deposition testimony of Ciba–Geigy Project Manager Dr. Furler, asserts that the material shipped in the drums was so severely contaminated that the basic chemical composition of the pigment was altered. Dr. Furler's testimony never mentioned a change in the chemical composition, but he did testify that the material contained in the drums was so "heavily disturbed" that it was a "completely different" substance. Deposition of Dr. Gaudenz Furler, Sept. 11, 1993, at 41. Plaintiff disputes this claim, insisting that the 10405 was merely mixed with some debris and remained chemically identical to the 10405 approved under the contract. Plaintiff cites the fact that the paint passed both plaintiff's and GSA's tests to support this contention.

After GSA paid plaintiff $28,776.00 in termination costs for the drums of 10405 pigment, GSA discovered that the pigment used to manufacture the paint contained debris from the fire. On December 10, 1990, the contracting officer demanded payment of $41,326.00 in reimbursement from plaintiff. This sum represented the money paid to plaintiff during the contract settlement, plus 9 percent profit, with transportation and "hazardous waste" disposal costs added. Plaintiff has not paid this demand.

The instant claim resulted when plaintiff appealed GSA's decision by filing a complaint in the United States Court of Claims on August 16, 1991. Defendant has asserted several counterclaims for fraud and moved for summary judgment. Plaintiff cross-moved for summary judgment on defendant's counterclaims.

The parties do not agree whether GSA knew that plaintiff's purchase of the drums of 10405 predated their contract or whether GSA ever knew that the 10405 pigment had been in a fire. Moreover, the parties dispute whether the facts substantiate defendant's claim of willful fraud by plaintiff both for using the recovered 10405 pigment to manufacture paint and for claiming contract reimbursement on this material.

## DISCUSSION

### 1. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In resolving the cross-motions, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Uncontested material facts also have been

found consistent with the rule that, in respect of any facts that may be considered as contested, each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

A trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. (citation omitted).

2. *First counterclaim: termination for convenience certifications—31 U.S.C. § 3729(a)(1)*

The False Claims Act (the "FCA"), 31 U.S.C. § 3729(a), provides, in pertinent part:

(a) Liability for certain acts.—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

. . . .

is liable for certain monetary penalties and treble damages.

■ The FCA does not require proof of a specific intent to defraud. 31 U.S.C. § 3729(b). The intent requirement can be satisfied if the contractor acts with actual knowledge, in deliberate ignorance, or with reckless disregard for the truth or falsity of the information. *See id.; Tyger Constr.*

*Co., Inc. v. United States*, 28 Fed.Cl. 35, 55 (1993) (denying motion to dismiss counterclaims).

Defendant cites *Miller v. United States*, 213 Ct.Cl. 59, 550 F.2d 17, 23 (1977), as the standard for finding a violation under § 3729(a)(1) of the FCA. Under this test the government must show that plaintiff "present[ed] ... for payment ... any claim upon or against the Government ... for payment ... knowing such claim to be false." [2]

■ In its first counterclaim, defendant asserts that plaintiff falsely and fraudulently certified to the Government that the 10405 it returned was termination inventory. Defendant asserts that plaintiff acquired the material it represented as termination inventory prior to November 4, 1986, the date on which the contract was bid. Because the material was purchased before the contract was awarded, it could not possibly have been purchased for performance of the contract. Further, defendant contends that because the material was not new 10405 as required by the contract, it failed to meet contract specifications and was not allocable to the contract. For these reasons the 10405 could not rightly be claimed as termination inventory.

Defendant insists that the material represented in the termination for convenience settlement was actually contaminated waste that was neither acquired for nor allocable to the contract. According to defendant, plaintiff's officials submitted a claim for this material knowing that it was not termination inventory. GSA would not have paid plaintiff had the material not been misrepresented.

Plaintiff responds that the termination for convenience certifications did not verify the quality, but only the quantity, of the 10405. The performance properties of the

---

**2.** While defendant cites *Miller,* the test enunciated in defendant's motion for summary judgment comes from *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D.Fla.1989). The *Stinson* court required that the Government show that plaintiff 1) presented or caused to be presented; 2) to a government officer or employee; 3) for payment or approval; 4) a claim that plaintiff "knew" was false; and 5) the United States suffered damages. *Id.* 550 F.2d at 23. While the two tests differ slightly, the relevant requirement for resolution of the instant motions is the knowing submission of false or fraudulent claims.

10405 were unchanged despite having been mixed with the fire debris and remained "new" or "recycled" as defined by FAR § 52–210. Finally, defendant cannot claim fraud because GSA had knowledge of the pigment's condition at the time of the settlement. Plaintiff argues that it could not have "knowingly" submitted a false claim because GSA was privy to all information concerning the condition of the pigment.

■ GSA's knowledge of the contents of the drums is relevant for purposes of section 3729(a). Intent to deceive need not be proved under the Act. *Tyger*, 28 Fed.Cl. at 55. What must be proved is that the contractor knowingly presented a false or fraudulent claim. *U.S. ex rel Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991) (stating that "knowledge [of the Government] may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."); *see United States ex. rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1156–57 (2d Cir.), *cert denied*, —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993) (agreeing with the Ninth Circuit's analysis in *Hagood* that the relevant factor for FCA analysis is "the knowing presentation of what is known to be false"). If GSA officials knew that the drums referred to in the termination for convenience settlement contained debris and plaintiff did not know that its representation of the contents was false, plaintiff is not guilty of "knowingly" making a false or fraudulent statement to the Government.

It is unclear from the record what exactly the parties agreed on in their termination for convenience settlement. While defendant has put forward strong evidence that plaintiff misrepresented the contents of the barrels, sufficient doubt exists regarding both GSA's knowledge of the contents of the drums and plaintiff's awareness of GSA's knowledge to preclude summary judgment on this point.

■ Plaintiff's attempts to characterize the material as "new or recycled," however, are unpersuasive and irrelevant. If plaintiff led GSA to believe that GSA was acquiring new 10405 and that GSA remained unaware of the extent of the debris contained in the barrel, it is irrelevant whether the material, once screened, was "just as good" as new 10405. The FCA does not recognize the "just as good" exception that plaintiff has put forward. A misrepresentation is not negated by the fact that it is almost correct. Although the record at present is insufficient to find a misrepresentation on summary judgment, it is apparent that sufficient evidence to support such a finding may be established at trial.

### 3. Second counterclaim: certified invoices for paint—31 U.S.C. § 3729(a)(2)

■ Defendant's second counterclaim addresses the paint shipments made with pigment recovered from the 1985 fire. Defendant asserts that since the 10405 used for these batches came from screened 10405 that had been previously mixed with fire debris, it did not conform with the express terms of the contract prohibiting the use of reformulation without prior approval and the use of "used" materials.

Defendant puts forth the test used in *United States ex rel. Stinson, et al. v. Provident Life & Accident Ins. Co.*, 721 F.Supp. 1247 (S.D.Fla.1989), which requires the Government to establish that plaintiff "(1) made, used, or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement and the claim were false or fraudulent; (3) the defendant knew that the record or statement and the claim were false or fraudulent; and (4) the United States suffered damages as a result." *Id.*, at 1259.

In its counterclaim defendant claims that plaintiff misrepresented the condition of the pigment, violated QPL standards by manufacturing paint from "damaged" materials, and otherwise defrauded GSA. Only "new" and unadulterated 10405 pigment could be used to formulate Forest Green Type II paint, according to QPL standards. Defendant argues that the

10405 in the drums was contaminated and damaged. Defendant therefore contends that plaintiff failed to meet QPL standards for the nine batches of Forest Green Type II paint that the Government purchased. Defendant also takes the position that plaintiff misrepresented the contents of the drums until the contract settlement for the 10405 pigment was complete.

Plaintiff responds that all the Forest Green Type II paint it manufactured met QPL standards and that the termination inventory request for the remaining 10405 pigment was proper and reasonable. According to plaintiff, the 10405 was acceptable for use according to industry practices and government requirements. Plaintiff claims that the 10405 was recyclable, since the fire debris could be easily removed, and was "new" in the sense that it properly could be used in connection with the contract. Plaintiff argues that using its existing stock of 10405 was a reasonable and fair interpretation of the QPL requirements. Plaintiff informed GSA that the 10405 had been in a fire and that GSA inspectors examined the drums of 10405 and saw its condition at the time of the contract settlement, but raised no objections. GSA inspectors therefore had notice of the fire at the time of the contract reimbursement claim.

Similar difficulties arise with this claim as are present in the first counterclaim. The court is unable to rule on summary judgment that the 10405 in dispute in the paint claim differed from the QPL requirements to an extent that would constitute a violation of the QPL requirements. Again, this issue will be developed at trial. The court notes at this point that defendant's burden in proving deviation from the QPL would not be a heavy one. Defendant is correct in asserting that the Government is entitled to receive what it bargained for— in this case, "new" 10405.

4. *Third counterclaim; CDA, return of insupportable claim amounts— 41 U.S.C. § 604*

▄ The fraudulent claims provision of the CDA provides, in pertinent part:

If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government....

41 U.S.C. § 604. The Contract Disputes Act defines misrepresentation as

a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.

41 U.S.C. § 601(7). In order to obtain reimbursement for a paid claim, defendant must prove that a part of plaintiff's claim is unsupported and that this lack of support is due to fraud or misrepresentation intended by plaintiff to deceive the government. *Tyger*, 28 Fed.Cl. at 58.

▄ Defendant claims that since the submissions under which plaintiff received payments for the termination for convenience were fraudulent, plaintiff is unable to support portions of its claim amounting to $97,065.00. Because plaintiff is unable to support the payment plaintiff received, plaintiff must return this amount to the Government. *United States v. Turner Constr. Co.*, 827 F.2d 1554, 1558 (Fed.Cir. 1987).

Citing this court's decision in *Tyger*, plaintiff responds that such a forfeiture is mandated only if the claim was paid due to fraud. 28 Fed.Cl. at 59. Since GSA knew of the condition of the 10405 and the accuracy of the certifications submitted by plaintiff, plaintiff asserts that no fraud occurred.

Because the intent of the contractor is a necessary element of this provision, GSA's knowledge of the condition of the 10405 is crucial to the resolution of this counterclaim. Plaintiff cannot be said to have acted with intent to deceive if both plaintiff and GSA were aware of the condition of the 10405. Because a significant dispute exists regarding GSA's knowledge on this point, summary judgment is inappropriate.

**286**

5. *Fourth counterclaim: special plea in fraud—28 U.S.C. § 2514*

■ The claim forfeiture statute provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Claims Court shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514.

Defendant's final counterclaim seeks a forfeiture of all claims made by plaintiff under the contract. Defendant argues that since plaintiff procured payment from the Government through fraud, plaintiff should forfeit all of its claims against the United States.

As discussed with regard to defendant's first two counterclaims, sufficient factual dispute exists to preclude a finding of fraud. Summary judgment is thus inappropriate on defendant's special plea in fraud.

The remaining issues cannot be resolved in favor of one party or the other due to these substantial factual questions. Summary judgment is therefore not appropriate for resolution of either party's claims.

### CONCLUSION

Based on the foregoing, the parties' cross-motions for summary judgment are denied. A scheduling order has been entered separately.

**IT IS SO ORDERED.**