**UNITED STATES of America, ex rel. William I. KOCH and William A. Presley, Plaintiffs,**

v.

**KOCH INDUSTRIES, INC., et al., Defendants.**

**No. 91–CV–763–K.**

United States District Court, N.D. Oklahoma.

July 9, 1999.

Phil Pinell, United States Attorney, Tulsa, OK, Gordon Jones, U.S. Department of Justice, Washington, DC, Steve Altman, U.S. Dept of Justice, Washington, DC, for United States of America.

David Edward Keglovits, Kristin L. Oliver, Gable & Gotwals, Tulsa, OK, Roy Morrow Bell, Timothy P. Irving, James W. Stubblefield, Miller Boyko & Bell, San Diego, CA, James M. Sturdivant, Gable & Gotwals, Tulsa, OK, for William I. Koch William A. Presley.

Harvey D. Ellis, Jr., Clyde A. Muchmore, Timila S. Rother, Mark S. Grossman, Wesley C. Fredenburg, Crowe & Dunlevy, Oklahoma City, OK, Robert L. Howard, James M. Armstrong, Foulston & Siefkin, Wichita, KS, David Luce, Wichita, KS, for Koch Industries, Inc., Koch Exploration Co. Koch Service Inc.

### ORDER

KERN, Chief Judge.

On January 27, 1999 Magistrate Judge Joyner entered his Report and Recommendation in the above styled case regarding the Plaintiffs' and Defendants' cross motions for summary adjudication. The Magistrate Judge recommended that the Plaintiffs' motion and Defendants' motion for partial summary judgment be GRANTED IN PART and DENIED IN PART. Specifically, the Magistrate concluded that Koch Industries Inc. (hereinafter "KII")[1] can be liable under the False Claims Act ("FCA") in connection with its purchases from 100% division order leases, and that there are material questions of fact regarding KII's knowledge of the existence of a federal or Indian royalty interest on the 100% division order leases from which it purchased oil. Furthermore, the Magistrate found, if liability under the FCA is established, a penalty of between $5,000 and $10,000 be assessed against KII for each lease on an MMS–2014, Osage Royalty Report or monthly check stub when KII reported and paid for less oil than it actually took from that lease during the previous month.

The parties have filed timely objections and responses to Magistrate Joyner's Report and Recommendation. 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). This Court has conducted a *de novo* review of the record, including the parties' written objections to the Magistrate's conclusions. Any part of the Magistrate's report to which the parties have not raised any objection has been accepted and adopted by this Court. *See Moore v. United States,* 950 F.2d 656 (10th Cir.1991); and *Talley v. Hesse,* 91 F.3d 1411, 1412–1413 (10th Cir. 1996).

### I. SUMMARY OF UNDISPUTED FACTS:

During the relevant time period, KII purchased crude oil from numerous federal and Indian leases.[2] The federal and

1. Koch Industries, Inc. is the parent corporation over all the corporations that are named as defendants in this case. The use of the term "KII" in the Magistrate's Report and Recommendation, as well as in the District Court's Order, is intended to refer to all named Defendants, unless otherwise specified.

2. The term "Indian lease" is meant to refer to those leases held by American Indian nations and overseen by the Bureau of Indian Affairs.

Indian leases at issue in this lawsuit are administered by the United States Department of the Interior ("DOI"). The Minerals Management Service ("MMS") is an agency within the DOI and the MMS is responsible for collecting royalty payments on the federal and Indian leases at issue in this lawsuit, except for Osage Indian leases.

The Osage Agency is an agency within the Bureau of Indian Affairs ("BIA"), and the BIA is itself an agency within the DOI. The Osage Agency is responsible for collecting royalty payments on the Osage Indian leases at issue in this lawsuit. Thus, all royalties paid for crude oil purchased by KII from the federal and Indian leases at issue in this lawsuit were ultimately paid/transmitted to the United States via an agency within the Department of Interior either the MMS or the Osage Agency.

Each time KII purchases oil from a lease it must "gauge" that oil to determine how much oil was purchased and at what price. For all of the purchases at issue in this lawsuit, Plaintiffs allege that KII's employees and agents, at management's direction or with management's knowledge, created or used a false run ticket, tank table, and/or meter correction factor. KII allegedly engaged in these falsehoods in an effort to reduce its obligation to pay for the oil it purchased from the federal and Indian leases at issue in this lawsuit.

When KII purchases oil it may or may not assume the lessee's royalty obligation. If KII does not expressly assume the lessee's royalty obligation, KII remits 100% of the proceeds to the lessee, and the lessee is then responsible for paying the royalty owner. KII refers to these as 100% division order purchases because the division order on these leases requires 100% of the proceeds to be paid to the lessee. Under these circumstances, KII

pays for the oil it purchases by issuing the lessee a monthly check. The stub of each check contains a detailed accounting of all the transactions involving that lease for the prior month. The stub contains the volumes, prices, and other details in support of the amount of the check. The lessee then uses the monthly check stub to prepare MMS–2014's and Osage Royalty Reports.

There were two primary legal issues presented for ruling before the Magistrate based on the undisputed facts. First, the parties sought a legal ruling as to whether KII can be liable under the FCA in connection with its purchases from 100% division order leases. And second, if liability under the FCA is established, the parties sought clarification regarding which of KII's acts constitutes separate, individual violations of the FCA for which a civil penalty must be imposed. Having reviewed the Magistrate's decision *de novo,* the Court finds the Report and Recommendation should be affirmed and adopted in its entirety.

### II. OBJECTIONS AND DISCUSSION:

**A. Defendants' First Objection: The Magistrate Erred in Finding that False Claims Act Penalties Could Be Based on a Per Lease Deconstruction of the Submissions to the Government Made by KII; and**

***Plaintiffs' First Objection:* The Magistrate Erred in Concluding That Penalties Should Be Not Imposed under 31 U.S.C. § 3729(a)(7) Based on the Run Tickets, Tank Strapping Reports, and Meter Prover Reports Which Contain the Actual False Data Created by Defendants and Which Ultimately Resulted in the Underpayment of Royalties to the Federal Government.[3]**

---

**3.** Plaintiff's Second Objection states: "[P]laintiffs object to the Report and Recommendation insofar as it recommends that penalties should only be assessed for each lease listed on an MMS–2014, Osage Royalty Report, or monthly check stub. *Plaintiffs respectfully*

*request that the Court modify the ruling to reflect the fact that the MMS–2014 form did not come into use as the exclusive means of reporting royalties to the government until approximately January 1984."* The Court's Order resolving the issue of the applicable

■ The legal question at issue required the Magistrate to determine which actions of the Defendants served as a triggering mechanism for an FCA penalty. Undertaking an analysis of Supreme Court precedent on the matter, the Magistrate concluded: "[I]f Plaintiffs can demonstrate, after viewing all of the line items relating to a particular lease together, that KII reported and paid for less oil than it actually took from that lease during the previous month, then a *penalty should be imposed in connection with that lease.*" (Emphasis added).

Both parties object to the Magistrate's conclusion. Plaintiffs have alleged that KII falsified hundreds of run tickets each month for separate crude oil purchase transactions on federal and Indian leases, that the information from each false run ticket ended up on a monthly summary (the MMS–2014 or Osage Royalty Report), and that while the run tickets were kept for audit purposes only, the summary was sent to the Government along with a check for the total sum owed. Thus, Plaintiffs ask this Court to overrule the Magistrate's finding, and impose a fine for each fraudulent run ticket, tank strapping report, and meter prover report.

Defendants, on the other hand, move this Court to overrule the Magistrate's finding and apply a fine only for false MMS–2014's, Osage Royalty Reports, or check stubs submitted by KII. Defendants contend that the Magistrate erred by recommending that the documents be "deconstructed" to determine the number of alleged falsities subsumed in each form, and concluding that the Defendants are subject to penalties for each lease at issue.

The FCA does not clearly indicate how Courts should deal with multiple violations of the FCA when charging violators with penalties. The FCA states that if a person commits any violation listed in § 3729(a),

that person "is liable to the United States Government for civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ..." The ambiguity in Congress' language offers little guidance on how to properly determine the number of penalties to be imposed in a given case, but the Supreme Court rejected the single penalty reading of the FCA in *Marcus v. Hess,* 317 U.S. 537, 552, 63 S.Ct. 379, 87 L.Ed. 443 (1943).

In *Marcus,* the trial court found that defendants had engaged in a collusive bidding scheme of PWA contracts. The plaintiff argued that the FCA's penalty should be applied to "every form" submitted by defendants in the course of their fraudulent scheme. Defendants argued that once liability under the FCA has been established, the Act only imposes one penalty. The Supreme Court rejected both arguments and found that defendants should be penalized "for each separate P.W.A. *project.*" *Id.* at 552, 63 S.Ct. 379. (Emphasis added).

In *United States v. Bornstein,* 423 U.S. 303, 307–308, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), the Supreme Court once again recognized that *Marcus* established multiple penalties were permitted under the FCA. In *Bornstein,* a prime contractor (Model) had a contract with the Government to provide radio kits containing electron tubes meeting certain specifications. A subcontractor (United), which was to supply the tubes, sent to Model in three separately invoiced shipments tubes that were not of the required quality but were falsely marked to indicate that they were. The radio kits that Model in turn shipped to the Government contained 397 of these falsely marked tubes. Model then sent thirty-five invoices to the Government for the kits, each invoice including claims for

statute of limitations, filed contemporaneously herewith, affirms the Magistrate's Report and Recommendation that all claims occurring before September 30, 1985 are barred by

the statute of limitations. Therefore, Plaintiff's Second Objection is deemed moot, and the Court will not address it on the merits.

payment for the falsely marked tubes. The Government alleged that United was liable for thirty-five $2,000 forfeitures, one for each invoice that it "caused" Model to submit. The Supreme Court held that a correct application of the Act's language requires that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the forfeiture. Thus, here United committed three acts that caused Model to submit false claims to the Government, and hence is liable for three $2,000 forfeitures representing those three shipments. The Court held that penalties must be imposed on the false invoices, but not on all the false information created by defendants in furtherance of its fraud.

This Court finds that *Bornstein* clearly precludes Plaintiffs' claim that a penalty should be imposed for every false entry made on the run tickets, tank strapping reports, and meter correction factors. The false information received by the lessees in this case is closely analogous to the false tube markings and false packing lists created by United in furtherance of its fraud, for which the Supreme Court clearly stated an FCA penalty should not attach. *Bornstein*, 423 U.S. at 312, 96 S.Ct. 523.

Furthermore, the run tickets, tank tables, and meter correction factors are subject to modification until an MMS–2014, Osage Royalty Report or monthly check stub is prepared and submitted to the DOI or a lessee. The run tickets, tank tables, and meter correction factors are, therefore, subsumed within their respective MMS–2014's, Osage Royalty Reports, and monthly check stubs. Thus, until KII has created a false MMS–2014, Osage Royalty Report or monthly check stub, KII has not committed its self to paying for less oil than it actually took from a particular lease. Therefore, Plaintiffs' objection is overruled.

Defendants rely heavily on *Bornstein* in support of their proposition that only a single penalty can be imposed in connec-

tion with an MMS–2014, Osage Royalty Report, or monthly check stub. Defendants contend that the MMS–2014s, Osage Royalty Reports, and monthly check stubs constitute submissions analogous to the three invoices for which a penalty was imposed in *Bornstein*. This Court disagrees, and finds *Bornstein* distinguishable.

First, the Court in *Bornstein* found that the defendants had actually only submitted three false invoices to the prime contractor. The prime contractor had then used the information from those three invoices to create 35 submissions. Here, the Defendants have allegedly created hundreds of false entries which were then tallied and "crunched" to create a report on oil purchased in relation to **each lease.** The information as to each lease was then collected and submitted together on one form, either an MMS–2014, Osage Royalty Report, or monthly check stub. Defendants urge this Court to find a parallel between the MMS–2014, Osage Royalty Report, or monthly check stub and the original three false invoices in *Bornstein*. No such analogy can be drawn. The three false invoices in *Bornstein* are most closely analogous to the false lease totals given to Plaintiffs. Defendants should not be allowed to benefit from the fact that information relating to several leases was collected together in one submission form. The fact that the leases were reported together on one piece of paper does not transform the Defendants' multiple acts of fraud.

Alternately, Defendants rely heavily on *United States v. Krizek*, 111 F.3d 934, 938–940 (D.C.Cir.1997), arguing once again for a single penalty for each MMS–2014, Osage Royalty Report, or monthly check stub. In *Krizek*, Dr. Krizek submitted an HCFA 1500, seeking reimbursement for services provided to recipients of Medicare and Medicaid. An HCFA 1500 relates to a single patient and it contains up to six CPT codes, identifying the procedures performed on the patient. The D.C. Circuit

imposed one penalty for each HCFA 1500, refusing to impose a penalty for each false CPT code on the form. KII argues that an MMS–2014, Osage Royalty Reports, and monthly check stubs are the same as the HCFA 1500 at issue in *Krizek*.

The HCFA 1500 is not functionally equivalent to the forms used by Defendants. In *Krizek*, the obligation at issue related to a specific patient, and here, the obligation relates specifically to a mineral lease. The lease is the most closely analogous entity to those which triggered liability and penalties in cases construing the FCA. *See Marcus*, holding that liability should attach for false entries related to each "project."

The basic violation alleged by Plaintiffs is that KII received delivery of oil from a particular lease over the course of a month and then paid for less than it actually took during that month. The violation relates to each lease as it was reported on monthly, and Defendants should not be allowed to escape additional penalties under the FCA because more than one lease was included on each report. The Magistrate's finding that a penalty should be imposed in connection with each lease from which KII allegedly took more oil than it paid for, is affirmed.

**B.** *Defendants' Second Objection: Magistrate Erred in Finding that KII Can Be Held Liable In Connection With Its Purchases From 100% Division Order Leases:*[4]

The Defendants object to the Magistrate's finding that KII can be held liable under the FCA for fraudulent submissions made on 100% division order leases. Defendants argue that KII's relationship with the Government on 100% division order leases is insufficiently direct to support liability. KII has no contract with the Government, submits no forms or payments for these purchases, and has no direct contractual relationship with the Government.

Defendants posit that the Magistrate erred in its conclusion on two fundamental bases. First, Defendants contend that the Magistrate erroneously construes the 1986 amendment to the False Claims Act to find that the definition of "claim" can be interpreted to permit an indirect, reverse false claim. Second, Defendants assert that the Magistrate erred because the "indirect reverse claim" has an insufficient federal nexus to be subject to the terms of the False Claims Act.

Defendants argue that the 1986 amendment to the FCA expressly provides for a cause of action for direct reverse false claims, but not indirect reverse false claims. Defendants contend the Magistrate Judge erred in concluding that indirect reverse false claims are included because Congress did not expressly exclude them from the ambit of the Act.

An indirect false claim is when a subcontractor prepares a false record which causes a government prime contractor to submit a false request for reimbursement to the government. *See e.g., Tanner v. United States*, 483 U.S. 107, 129, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (holding: "[T]he fact that a false claim passes through the hands of a third party on its way from the claimant to the United States does not release the claimant from culpability under the Act.") Here, given Plaintiffs' allegations, the 100% division order leases are indirect reverse false claims because KII attempted to reduce its obligation to pay money by causing the lessees on 100% division order leases to submit a false record to the DOI. KII allegedly caused the lessee to submit a false record to the DOI by submitting false monthly accountings to the lessees.

In 1986, Congress amended the FCA and added § 3729(a)(7) and § 3729(c).

---

**4.** Plaintiff does not object to the Magistrate's finding that KII is liable under the FCA for the 100% division order leases.

Congress added subsection (a)(7) to make it clear that the FCA imposed liability for reverse false claims. Section 3729(a)(7) provides as follows:

Any person who knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person...

Congress added subsection (c) to more specifically define "claim." Specifically, Congress added subsection (c) to make it clear that the FCA imposed liability for indirect false claims so long as government funds were involved. Subsection(c) provides as follows:

Claim Defined.—For purposes of this section, "claim" includes any request or demand whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

Defendants argued before the Magistrate, and reiterate here, that because subsection (a)(7) and (c) were added at the same time, the absence of any reverse false claim language in subsection (c) conclusively demonstrates that Congress did not intend the FCA to impose liability for indirect reverse false claims.

Defendants also assert the proposition that "Claim defined" is a thorough and unequivocal definition of "claim." However, the Magistrate found that subsection (c) is not an attempt to exhaustively define "claim." Rather, subsection (c) explains what a claim "includes," but leaves the definition open to interpretation by the courts.

The Magistrate found, further, that such an open definition of "claim" is supported by the legislative history of the FCA. Congress added subsection (c) to accomplish one purpose—"to overrule [*United States v.*] *Azzarelli[*, 647 F.2d 757 (7th Cir.1981) ] and similar cases which [had] limited the ability of the United States to use the act to reach fraud perpetrated in federal grantees, contractors or other recipients of Federal funds." S.Rep. 345, 99th Cong., 2d Sess., p. 22, reprinted in 1986 U.S.C.C.C.A.N. 5266 (July 28, 1986). The legislative history from Congress recognizes that a claim may take many forms, but a claim at its essence is the creation or use of any false record which ultimately causes a loss to the government. *Id.* at 9–10 and 21–22. The Magistrate therefore concluded that, given the history and purpose of the Act, the term "claim" as used in the FCA also "includes" indirect reverse false claims like those at issue in this case.

■ This Court, having conducted a *de novo* review on this issue, is in agreement with the Magistrate's analysis. Congress' intent in expanding and amending the FCA in 1986 was to enable the statute to reach further to protect the Government from fraud due to false filings. The Court is not persuaded by Defendants' argument that, because Congress did not explicitly include indirect reverse false claims in the language of the 1986 amendment, that it intended to exclude them. The language of the statute, particularly that section which defines a "claim," appears to have been constructed with flexibility and the possibility of permissive interpretation in mind.

Additionally, the Court is persuaded by an examination of the legislative history of the FCA, and rejects the Defendants' contention that Congress did not intend to extend the FCA to reach indirect reverse false claims. As the Magistrate pointed out, to accept Defendants' position on this

issue is to accept the proposition that the 1986 amendment was intended to aid the Government in protecting itself from the submission of a false record in an attempt to *get money from the Government,* but not to protect itself from a false statement submitted in an attempt to *reduce an obligation to pay money to the Government.* This proposition flies in the face of the permissive language of the statute and the legislative history of the 1986 amendment. While it is true that Congress did not explicitly include indirect reverse false claims within the gambit of the FCA, it is not clear to this Court that Congress intended to exclude them. In light of the policy justifications for the FCA and the 1986 amendment, the Court is in agreement with the Magistrate on this issue.

Alternately, Defendants contend they should not be held liable for the 100% division order leases, because there is not a sufficient nexus between the federal Government and the Defendants regarding these contracts. Defendants urge this Court to examine the issue in the context of the absence of a contractual relationship between Defendants and the Government regarding these leases. Defendants contend that Congress went to extreme lengths to ensure that the False Claims Act did not reach every kind of fraud practiced on the Government. Defendants argue that applicable case law supports the contention that the FCA, legislative history, and Supreme Court interpretations do not support a finding of liability on 100% division order leases.

Plaintiffs, on the other hand, frame the issue as a matter of statutory construction, contending that Defendants' liability arising from fraudulent claims filed in reference to the 100% division order leases turns on whether Defendants were aware of the loss the Government would incur due to their fraud. Plaintiffs have alleged that KII violated the FCA when it falsified measurements on 100% division order federal and Indian leases, because those false measurements caused the lessee or opera-

tor to understate its royalty obligation to the Government. When KII fraudulently altered run tickets in 100% division order leases, it not only "made a false record or statement to conceal, avoid or decrease an obligation," it also "caused" the lessee to make a false record or statement. In either case, the only question is whether KII did so "knowingly."

The Magistrate did not find, conclusively, that Defendants were liable under the FCA for 100% division order leases, but that there exists a material issue of fact as to whether the Defendants "knowingly" induced the falsification of documents in relation to federal or Indian leases. Thus, the Magistrate concluded, this was not an appropriate issue for summary judgment.

The FCA defines "knowing" and "knowingly" as:

> [T]he terms "knowing" and "knowingly" mean that a person, with respect to information—
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

The evidence introduced before the Magistrate suggested that, applying the three prongs of § 3729(b), a reasonable jury could find that Defendants knew that a federal or Indian lease was involved in many of the 100% division order leases from which Defendants purchased oil. The names of several of the 100% division order leases contain some indication that they are federal or Indian leases, and there is some evidence that a sign or other marking physically present at the lease would identify the lease as a federal or Indian lease at the time of the purchase of the oil. Evidence was introduced demonstrating that Defendants required the lessees from which it purchased to complete a

form titled "Purchase and Connection Acknowledgment" and "Federal Lease Notification," and that these forms would alert Defendant that a federal interest was on the lease. Finally, there is also evidence that the operators of federal and Indian leases and the Bureau of Land Management would occasionally send materials to the Defendants which would identify a particular lease as a federal or Indian lease.

Defendants have attempted to distinguish the facts of this case from Supreme Court precedent which interprets the FCA, in hopes of precluding even the mere question of liability for 100% division order leases at trial. Defendants have cited several cases in which the Supreme Court analyzed the nexus between the defendant and the Government in order to determine if the claims at issue were covered by the FCA.[5] However, none of these cases explicitly precludes an FCA claim where there are facts present which may provide a sufficient nexus to trigger liability.

■ The Magistrate concluded, and this Court agrees, that there are genuine issues of material fact as to whether Defendants were aware that these contracts involved either Indian or federal leases. Denial of summary judgment on this point does not immediately signify that liability must attach; rather, it indicates that the "knowingly" prong of the FCA is one of fact, and should be decided by the finder of fact at trial and not prematurely decided on summary judgment.

Thus, this Court finds that a genuine issue of material fact exists as to whether the Defendants knowingly caused the inducement of fraud of the federal Government. Therefore, summary judgment is not appropriate, and the Magistrate's finding that the Defendants may be held liable for the 100% division order leases is affirmed.

**C. *Plaintiffs' Third Objection:* The Magistrate's Recommendation Should Have Included Language Which Mandates an FCA Penalty Each Time a KII Entry Was "False."**

Plaintiffs object to the Magistrate's recommendation to the extent that it suggests that KII should only be penalized for false entries which resulted in KII taking more oil than it paid for, rather than penalizing KII for each false entry, regardless of whether the Government suffered a loss. Plaintiffs argue that the Government need not actually suffer a loss in order to assert and obtain statutory damages under the False Claims Act. Citing *US ex rel. Precision Co. v. Koch Industries,* Inc., 1995 U.S.Dist. LEXIS 20832, *58 (N.D.Okla. 1995). Therefore, Plaintiffs request that the Court modify the Magistrate's report to the extent that it recommends a contrary ruling.

As an initial matter, this Court has affirmed the Magistrate's finding that Defendants will be imposed a penalty each time a monthly lease total was false. The Court rejected Plaintiffs' argument that the run entries, etc. should serve as the basis for an FCA penalty. That said, this Court finds that it need not reach the question of actual damages under the FCA. If the Defendants are imposed a penalty for each alleged false entry on the total amount of oil taken on a lease in a given month, then actual damages exist *per se.* To find that the total oil taken was greater than the total oil paid for is, in essence, to find both that the entry was

---

**5.** Among the cases cited by Defendants are: *Marcus v. Hess,* 317 U.S. 537, 542, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (in which the Court based its holding on an examination of "the exact nature of respondents' relation to the [federal] government."); *US v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (in which the Court, once again, closely examined the relationship of a subcontractor who caused a prime contractor to submit a false claim to the Government, and found the claim was covered under the FCA.); and *Smith v. United States,* 287 F.2d 299 (5th Cir.1961) (in which the Court held that liability attached under the FCA because of the direct relationship between the defendant and the Government).

false and that the Government has, necessarily, suffered some actual damages in underpayment. The Court finds that the only way Plaintiffs' argument would be relevant is if the Court accepted the Plaintiffs' proposition that each run entry should serve as a basis for an FCA penalty, which it did not.

Additionally, as Defendants point out, Plaintiffs' Third Objection is seeking clarification on an issue not actually raised before the Magistrate. That is, the question of whether actual damages must be proven in order for penalties to be imposed was never specifically briefed and argued. Therefore, Defendants contend this question of law was not an issue before the Magistrate, and is not a proper objection before this Court.

The Court finds that the Magistrate's recommendation, finding that Defendants are liable under the FCA where it is shown that Defendants took more oil than was paid for, is affirmed.[6]

### III. Conclusion:

The Court finds that the Plaintiffs' Objection (# 432) and the Defendants' Objection (# 431) to the Magistrate's Report and Recommendation (# 425) are DENIED in their entirety. The Magistrate's Report and Recommendation (# 425) is AFFIRMED and ADOPTED in its entirety. Plaintiffs' Motion for Partial Summary Adjudication (# 211) and Defendants' Motion for Partial Summary Adjudication (# 219) are hereby DENIED in part and GRANTED in part.

### TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132
   A. GAUGING—RUN TICKETS, TANK TABLES AND METER CORRECTION FACTORS . . . . . . 1133
   B. 100% DIVISION ORDER VS. NON–100% DIVISION ORDER LEASES . . . . . . . . . . . . . 1134
   C. KII's PAYMENT METHODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1134
      1. When KII Has Assumed the Lessee's Royalty Obligation—Non–. . 1134
         100% Division Order Leases
         a. *Purchases From Federal and Non–Osage Indian Leases* . . . . . . . . . 1134
         b. *Purchases From Osage Indian Leases* . . . . . . . . . . . . . . . . . . . . . . . . 1135
      2. When KII Has Not Assumed the Lessee's Royalty Obligation—100%. . 1135
         Division Order Leases
II. LEGAL ISSUES PRESENTED BY THE UNDISPUTED FACTS . . . . . . . . . . . . . 1135
III. IF LIABILITY UNDER THE FCA IS ESTABLISHED, THE COURT SHOULD IMPOSE A PENALTY AGAINST KII OF BETWEEN $5,000 AND $10,000 FOR EACH LEASE ON AN MMS–2014, OSAGE ROYALTY REPORT OR MONTHLY CHECK STUB WHEN KII REPORTED AND PAID FOR LESS OIL THAN IT ACTUALLY TOOK FROM THAT LEASE DURING THE PREVIOUS MONTH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1136
   A. THE MMS–2014'S, OSAGE ROYALTY REPORTS AND MONTHLY CHECK STUBS . . 1136
   SHOULD BE USED TO DETERMINE THE NUMBER OF PENALTIES IN THIS CASE, NOT THE RUN TICKETS, TANK TABLES OR METER CORRECTION FACTORS.
      1. Supreme Court Precedent . . . . . . . . . . . . . . . . . . . . . . : . . . . . . . . . . 1137
         a. *Marcus v. Hess* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1137
         b. *United States v. Bornstein* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1137
      2. Tenth Circuit Precedent—*Fleming v. United States* . . . . . . . . . . . . . . . . . 1138
      3. Decisions From Other Courts of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . 1139
         a. *United States v. Rohleder* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1139
         b. *United States v. Grannis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1140
         c. *Miller v. United States* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1141
         d. *United States v. Krizek* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1143
      4. Plaintiffs' Attempt to Distinguish The Cases Discussed Above . . . . . . . 1143
      5. KII's Eighth Amendment Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1145

**6.** The Magistrate concluded: "[I]f Plaintiffs can demonstrate . . . that KII reported and paid for less oil than it actually took from that lease during the previous month, then a penalty should be imposed in connection with that lease."

B. A PENALTY SHOULD BE IMPOSED FOR EACH LEASE ON AN MMS–2014, OSAGE ROYALTY REPORT OR MONTHLY CHECK STUB WHEN KII REPORTED AND PAID FOR LESS OIL THAN IT ACTUALLY TOOK FROM THAT LEASE DURING THE PREVIOUS MONTH. ........................................................ 1145

KII CAN BE LIABLE UNDER THE FCA IN CONNECTION WITH ITS
IV. PURCHASES FROM 100% DIVISION ORDER LEASES. ................... 1147
  A. THE FCA IMPOSES LIABILITY FOR INDIRECT REVERSE FALSE CLAIMS ......... 1147
  B. THERE ARE MATERIAL QUESTIONS OF FACT REGARDING KII'S KNOWLEDGE OF THE EXISTENCE OF A FEDERAL OR INDIAN ROYALTY INTEREST ON THE 100% DIVISION ORDER LEASES FROM WHICH IT PURCHASED OIL. ................... 1148
V. DOES RECORDING A VALUE ON A RUN TICKET OTHER THAN THE VALUE WHICH WAS ACTUALLY OBSERVED BY A GAUGER MAKE THE RUN TICKET *PER SE* FALSE? ..................................... 1149
RECOMMENDATION ................................................... 1150
OBJECTIONS ........................................................ 1150

## *REPORT AND RECOMMENDATION*

JOYNER, United States Magistrate Judge.

The following motions have been referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636 and Fed.R.Civ.P. 72:

1. Plaintiffs' Motion for Partial Summary Adjudication, [Doc. No. 211]; and

2. Defendants' Cross Motion for Partial Summary Judgment, [Doc. No. 219].

For the reasons discussed below, the undersigned recommends that Plaintiffs' motion and Defendants' motion for partial summary judgment be **GRANTED IN PART and DENIED IN PART.**

1. Prior to October 27, 1986, the FCA's civil penalty was $2,000. The FCA was amended on October 27, 1986 and the civil penalty was raised from $2,000 to between $5,000 and $10,000. This lawsuit involves both pre– and post–1986 claims. Plaintiffs have not asked for a finding, or stated their belief, regarding the retroactive effect of the increase in civil penalties. Thus, until Plaintiffs demonstrate that the 1986 amendment should be applied retroactively, the undersigned will assume that for pre-October 27, 1986 claims the civil penalty will be $2,000, and that the civil penalty for post-October 27, 1986 claims will be between $5,000 and $10,000.

2. Koch Industries, Inc. is the parent corporation over all of the corporations that are named as defendants in this case. The undersigned's use of the term KII in this Report

If liability is established under the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)–(7), a civil penalty is to be assessed.[1] The parties' motions for partial summary judgment ask the Court to determine how the FCA's civil penalty will be applied given the facts of this case. The undersigned finds that Koch Industries, Inc. ("KII")[2] may be penalized under the FCA for each lease listed on an MMS–2014, Osage Royalty Report or Monthly Check Stub if KII reported and paid for less oil[3] than it actually took from that lease during the previous month.

## I. INTRODUCTION[4]

The federal and Indian leases at issue in this lawsuit are administered by the United States Department of the Interior ("DOI"). The Minerals Management Service ("MMS") is an agency within the DOI,

and Recommendation is intended to refer to all named defendants, unless otherwise specified.

3. KII purchased oil and natural gas from the federal and Indian leases at issue in this lawsuit. The parties' motions for partial summary judgment seek legal rulings regarding the application of the FCA's penalty provision to KII's oil purchases. The parties' motions do not seek rulings regarding KII's natural gas purchases. That issue will be resolved at a later time, if the Court determines that such a ruling is necessary.

4. For purposes of the parties' motions for partial summary judgment, the undersigned finds that the facts summarized in this section are material and undisputed.

and the MMS is responsible for collecting the royalty payments on the federal and Indian leases at issue in this lawsuit, except for Osage Indian leases.

The Osage Agency is an agency within the Bureau of Indian Affairs ("BIA"), and the BIA is itself an agency within the DOI. The Osage Agency is responsible for collecting royalty payments on the Osage Indian leases at issue in this lawsuit. Thus, all royalties paid for crude oil purchased by KII from the federal and Indian leases at issue in this lawsuit were ultimately paid/transmitted to the United States *via* an agency within the Department of Interior—either the MMS or the Osage Agency.

### A. GAUGING—RUN TICKETS, TANK TABLES AND METER CORRECTION FACTORS

Each time KII purchases oil from a lease it must "gauge" that oil to determine how much oil was purchased and at what price. In the majority of purchases at issue in this lawsuit, KII hand gauged the oil. When KII hand gauges oil, it is purchasing oil from a particular storage tank on or near a lease. To hand gauge a tank, KII's employee or agent takes several physical measurements including the level of the oil in the tank before and after the oil is run out of the tank (the top and bottom gauge), the temperature of the oil before and after the oil is run out of the tank (the opening and closing temperature), the gravity of the oil and the basic sediment and water ("BS & W") content of the oil. KII's employee or agent records these measurements on a run ticket. *See* Doc. No. 211, Exhibit "A."

The measurement information on each run ticket is entered into KII's computerized oil accounting system. For each run ticket, KII's oil accounting system determines the price to be paid for the oil in part by using the gravity and BS & W measurements on the run ticket. KII's computerized accounting system also calculates the net volume of oil removed from the lease in part by using the top and bottom gauge and opening and closing temperature measurements on the run ticket.

For each tank from which KII purchases oil, KII complies a tank table. The table states each tank's capacity in barrels for various height increments. Tank tables are prepared by KII based on KII's prior, physical measurement or "strapping" of the tank. To calculate the net volume of oil purchased, KII's computerized accounting system compares the opening and closing gauge measurements on the run ticket with the previously compiled "tank table" for the tank from which the oil was purchased.

There are times when the oil KII purchases is gauged by a meter, and it is not hand gauged (e.g., when oil is purchased from a pipeline and not a storage tank). In these meter gauging situations, measurement information is recorded by the meter and that information, like the run ticket information, is entered into KII's computerized oil accounting system. To calculate the net volume of oil purchased from a particular meter, KII's computerized accounting system multiplies the net volume of oil recorded on the meter by a meter correction factor.

Meters are mechanical devices, and like any mechanical device, they have a margin of error. KII periodically calibrates/"proves" each meter to determine the meter's margin of error. A meter's margin or error is reflected and compensated for with a meter correction factor. A meter correction factor is derived by dividing the actual volume (i.e., the test amount) of oil passed through a meter by the volume recorded by the meter. For example, if 10 barrels of oil were passed through a meter during a "proving" and the meter registered 8 barrels of oil, that meter's correction factor would be 10/8 or 1.25. Thus, to determine the actual amount of oil passed through that meter, any volume recorded by the meter would need to be multiplied by 1.25.

For all of the purchases at issue in this lawsuit, Plaintiffs allege that KII's employees and agents, at management's direction

or with management's knowledge, created or used a false run ticket, tank table and/or meter correction factor. According to Plaintiffs, KII engaged in these falsehoods in an effort to reduce its obligation to pay for the oil it purchased from the federal and Indian leases at issue in this lawsuit. In particular, Plaintiffs allege that (1) when KII hand gauged oil, its employee or agent recorded false measurements on the run ticket; (2) when KII measured/strapped a tank to develop a tank table, its employee or agent recorded false tank measurements; and (3) when KII calibrated/proved a meter, its employee or agent calculated a false meter correction factor. *See* Doc. No. 414, Second Amended Complaint, Count I, ¶¶ 45–52.

## B. 100% DIVISION ORDER VS. NON-100% DIVISION ORDER LEASES

During the relevant time period,[5] KII purchased crude oil from numerous federal and Indian leases. Pursuant to the terms of the relevant mineral leases, the lessees on these federal and Indian leases are responsible for paying or transmitting to the United States, *via* the Department of the Interior, a royalty for any crude oil production. The United States' royalty may be paid by either the lessee or the purchaser of the oil.

When KII purchases oil it may or may not assume the lessee's royalty obligation. If KII does not expressly assume the lessee's royalty obligation, KII remits 100% of the proceeds to the lessee, and the lessee is then responsible for paying the royalty. KII refers to these as 100% division order purchases because the division order on these leases requires 100% of the proceeds to be paid to the lessee.

If KII does expressly assume the lessee's royalty obligation, KII first satisfies itself as to the correct ownership interest in the lease. If one of the interests is a federal or non-Osage Indian royalty inter-

est, KII executes a Payor Information Form, which is required by the MMS to identify KII as the party responsible for paying the royalty on the particular lease. KII then makes royalty payments directly to either the MMS for federal and non-Osage Indian leases or to the Osage Agency for Osage Indian leases.

## C. KII's PAYMENT METHODS

### 1. When KII Has Assumed the Lessee's Royalty Obligation—Non–100% Division Order Leases

#### a. Purchases From Federal and Non–Osage Indian Leases

To document its purchases from federal and non-Osage Indian leases on which it has assumed the lessee's royalty obligation, the MMS requires KII to prepare and file a form 2014, titled "Report of Sales and Royalty Remittance." KII prepares a monthly MMS–2014 to reflect its purchases for the prior month. One MMS–2014 is prepared each month for all federal leases and one MMS–2014 is prepared each month for all non-Osage Indian leases from which KII purchases (i.e., two MMS–2014's per month). If KII did not purchase from a particular lease during the previous month, the lease is listed on the MMS–2014, but with a zero quantity and price. Each month, KII reports and pays for its prior month's purchases by submitting completed MMS–2014's and by wire transferring its payment to the MMS. *See* Doc. No. 219, Exhibit "A–2."

The only payment document KII routinely files with the MMS is the MMS–2014. While the MMS may ask to see run tickets, tank tables or meter correction factor calculations during an audit, these items are not filed with or sent to the MMS. Nevertheless, if KII has created or used false run tickets, tank tables or meter correction factors in connection with purchases being reported on an MMS–2014,

---

**5.** Cross motions for partial summary judgment are pending regarding the applicable statute of limitations. *See* Doc. Nos. 260 and 280. The "relevant time period" currently ranges from May 25, 1979 to December 31, 1996, unless further limited by the Court when it rules on the parties' statute of limitations motions. *See also* Doc. No. 186 (setting the outside limit of the relevant time period).

then the MMS–2014 will itself be false. The MMS–2014 will be false because the use of false run tickets, tank tables and meter correction factors will cause the MMS–2014 to report that KII took less oil than it actually took from the federal and Indian leases shown on the MMS–2014.

### b. *Purchases From Osage Indian Leases*

To document its purchases from Osage Indian leases on which it has assumed the lessee's royalty obligation, KII is required by the Osage Agency to prepare a Royalty Report. As with the MMS–2014, KII prepares a monthly Osage Royalty Report to reflect its purchases for the prior month. One monthly Osage Royalty Report is prepared for all Osage leases from which KII purchased oil during the prior month. Each month, KII reports and pays for its prior month's purchases by submitting a completed Osage Royalty Report, along with its payment, to the Osage Agency. *See* Doc. No. 219, Exhibit "A–3."

The only payment document KII routinely files with the Osage Agency is the Osage Royalty Report. While the Osage Agency may ask to see run tickets, tank tables or meter correction factor calculations during an audit, these items are not filed with or sent to the Osage Agency. Nevertheless, if KII has created or used false run tickets, tank tables or meter correction factors in connection with purchases being reported on an Osage Royalty Report, then the Report will itself be false. The Osage Royalty Report will be false because the use of false run tickets, tank tables and meter correction factors will cause the Report to reflect that KII took less oil than it actually took from the Osage Indian leases shown on the Report.

### 2. When KII Has Not Assumed the Lessee's Royalty Obligation—100% Division Order Leases

When KII does not agree to assume the lessee's royalty obligation, KII pays for the oil it purchases by issuing the lessee a monthly check. The stub of each check contains a detailed accounting of all of the transactions involving that lessee for the prior month. The stub contains the volumes, prices, and other detail in support of the amount of the check. The lessee then uses the monthly check stub to prepare MMS–2014's and Osage Royalty Reports.

## II. LEGAL ISSUES PRESENTED BY THE UNDISPUTED FACTS

The liability provision of the False Claims Act provides as follows:

(a) Liability for certain acts.—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

31 U.S.C. § 3729(a).

Count I of Plaintiffs' Second Amended Complaint alleges that KII "violated 31 U.S.C. § 3729(a)(7) and other provisions of the False Claims Act by knowingly making, using, and causing to be made or used [false run tickets, tank tables, and meter correction factors] to conceal and decrease [KII's obligation] to pay money[/royalties] to the United States Government in exchange for crude oil." Doc. No. 414, ¶ 51.

In their motion for partial summary judgment, Plaintiffs argue that KII should be penalized between $5,000 and $10,000

under § 3729(a) each time KII falsified a run ticket, tank table or meter correction factor. KII argues that if Plaintiffs can establish liability under the FCA, then KII may only be penalized between $5,000 and $10,000 for each MMS–2014, Osage Royalty Report and monthly check stub created by KII. If the MMS–2014 and Osage Royalty Report are the records that are to be used to calculate the FCA's penalty, Plaintiffs argue in the alternative that a penalty must be imposed for each line-item on the MMS–2014 and Osage Royalty Report because each line item represents a different federal or Indian lease. The Court must, therefore, determine how the FCA's penalty provision will be applied given the facts of this case.

In its motion for partial summary judgment, KII argues that it cannot be liable or subject to penalties under the FCA regarding the 100% division order leases because when KII purchases from a 100% division order lease, KII does not submit any records or make any payments directly to the government. When KII purchases from a 100% division order lease, Plaintiffs allege that KII submits a false run ticket or check stub to a lessee in an attempt to pay for less oil than KII actually took. According to Plaintiffs, KII's submission of false records to the lessee causes the lessee to prepare a false MMS–2014 or Osage Royalty Report and pay the MMS or Osage Agency less royalties than that to which the government would otherwise be entitled. That is, the conduct alleged by Plaintiffs indirectly causes the government to receive less royalties. While KII recognizes that the FCA would impose liability for conduct that indirectly causes the government *to pay* for more oil than it purchased, KII argues that the FCA does not impose liability for conduct that indirectly caused the government *to be paid* for less oil than was sold from one of its leases. The Court must, therefore, determine whether the FCA imposes liability when conduct proscribed by the FCA indirectly causes the government to receive less money than that to which it would otherwise be entitled.

KII states in its motion that Plaintiff must prove the following to establish liability under § 3729(a) for purchases made from 100% division order leases: that KII knowingly (1) caused a lessee to make or use a false record or statement; (2) to conceal, avoid or decrease an obligation to pay or transmit money; (3) to the government. KII suggests that it cannot be held liable for purchases made from 100% division order leases because Plaintiffs cannot establish that KII knew that there was an obligation to the government. In other words, KII argues that even if it submits a false run ticket or check stub to a lessee in an attempt to pay for less oil than KII actually took, and even if those false records cause the lessee to prepare a false MMS–2014 or Osage Royalty Report which in turn causes the lessee to pay the government less of a royalty than that to which the government is entitled, KII cannot be liable under the FCA because KII has no way of "knowing" that the obligation it ultimately reduced was an obligation to the government. Plaintiffs argue that summary judgment in KII's favor is precluded because there are genuine issues of material fact regarding KII's knowledge, as that term is defined in 31 U.S.C. § 3729(b).

III. **IF LIABILITY UNDER THE FCA IS ESTABLISHED, THE COURT SHOULD IMPOSE A PENALTY AGAINST KII OF BETWEEN $5,000 AND $10,000 FOR EACH LEASE ON AN MMS–2014, OSAGE ROYALTY REPORT OR MONTHLY CHECK STUB WHEN KII REPORTED AND PAID FOR LESS OIL THAN IT ACTUALLY TOOK FROM THAT LEASE DURING THE PREVIOUS MONTH.**

A. THE MMS–2014's, OSAGE ROYALTY REPORTS AND MONTHLY CHECK STUBS SHOULD BE USED TO DETERMINE THE NUMBER OF PENALTIES IN THIS CASE, NOT THE RUN TICKETS, TANK TABLES OR METER CORRECTION FACTORS.

It must be recognized at the outset that the language of the FCA is not a model of

clarity on this issue. The FCA states that if a person does any of the things listed in § 3729(a), that person "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person...." On its face, this language does not unambiguously authorize multiple penalties. If the defendant violates the Act in any number of ways, "he is liable to the United States for a civil penalty."

This United States Supreme Court impliedly rejected the single penalty reading of the FCA in *Marcus v. Hess*, 317 U.S. 537, 552, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Nevertheless, the ambiguity in Congress' language is evident, and the act offers little guidance on how to properly determine the number of penalties to be imposed in a given case.

> "When the Almighty himself condescends to address mankind in their own language, his meaning, luminous as it must be, is rendered dim and doubtful by the cloudy medium through which it is communicated." The will of Congress is no less subject to inevitable distortion by reason of the inadequate medium through which it must be communicated.

*Grossman v. Young*, 72 F.Supp. 375, 378 (S.D.N.Y.1947) (citing The Federalist No. 37, at 243 (James Madison) (M.Dunne ed., 1901)).

### 1. Supreme Court Precedent

#### a. *Marcus v. Hess*

In *Marcus* the United States approved several Public Works Administration projects in the Pittsburgh area. These PWA projects were administered by local governmental units rather than the United States. These local governmental units would enter into subcontracts with local contractors to complete the projects. The defendants in *Marcus* were officers and members of the Electrical Contractors Association of Pittsburgh ("ECAP"), who had entered into subcontracts to perform work on various PWA projects. *Marcus v. Hess*, 317 U.S. 537, 539, 63 S.Ct. 379, 87 L.Ed. 443 (1943).

The plaintiff alleged and the trial court in *Marcus* found that defendants had engaged in a collusive bidding scheme. The officers and members of the ECAP agreed to rig the bidding process on the PWA contracts. The ECAP would average the prospective bids which its members would submit. The ECAP would then select one of its members as the one to receive the contract. The chosen member would submit a bid equal to the average bid and all other members would submit a bid higher than the average. In this manner, ECAP fraudulently controlled the bidding process for electrical work on the PWA projects. *Marcus*, 317 U.S. at 539, n. 1, 63 S.Ct. 379.

In the trial court, plaintiff argued that the FCA's penalty should be applied to "every form" submitted by defendants in the course of their fraudulent scheme. Defendants argued that once liability under the FCA has been established, the act only imposes one penalty. Without much discussion, the Supreme Court rejected both arguments and found that defendants should be penalized "for each separate P.W.A. project." *Marcus*, 317 U.S. at 552, 63 S.Ct. 379. The Court rejected the one penalty argument, finding that Congress could never have intended to allow defendants "to spread the burden progressively thinner over projects each of which individually increased their profit." *Id.*

#### b. *United States v. Bornstein*

In *Bornstein*, the United States contracted with Model Engineering & Manufacturing Corporation, Inc. ("Model") to provide radio kits to the Army. These kits were to contain electron tubes of a specified quality. Model subcontracted with United National Labs ("United") to supply the electron tubes. The radios were to contain new 4X150G electron tubes bearing markings showing that they had been manufactured in a plant whose quality con-

trol standards measured up to government requirements. The tube's markings were also to indicate that during manufacture the tubes had been inspected and approved by a government inspector at the plant. *United States v. Bornstein*, 423 U.S. 303, 307–308, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

United bought several hundred surplus tubes and falsely stamped them with the required markings. United also prepared 21 packing lists, each falsely stamped with a government inspector's "Eagle" acceptance stamp. United then sent 21 boxes of tubes to Model in three separately invoiced shipments. Model installed the tubes and sent 397 radio kits to the United States with falsely marked tubes in 35 separately invoiced shipments. *Bornstein*, 423 U.S. at 307–308, 96 S.Ct. 523.

The United States sued United and argued that United was liable for 35 penalties—one for each invoice United caused Model to submit to the United States. The trial court agreed with the United States and assessed 35 penalties against United. The Court of Appeals reversed, holding that because there was only one subcontract between Model and United, there should be only one penalty. The Supreme Court granted *certiorari* to resolve the following question: How should the number of penalties under the False Claims Act be counted when the United States sues a subcontractor on the ground that the subcontractor has caused the prime contractor to present a false claim. *Bornstein*, 423 U.S. at 306–308, 96 S.Ct. 523.

The Supreme Court began by recognizing that its decision in *Marcus* established that the FCA permits multiple penalties. To decide how many penalties were appropriate in *Bornstein*, the Court held that the focus must be on the conduct of the party from whom the penalty is sought

(i.e., United's, not Model's, conduct). Focusing on United's conduct, the Court found that United committed three acts which caused Model to submit false claims to the United States—the three separately invoiced shipments to Model. The Court held that United was not liable for 35 penalties based on the 35 invoices Model sent to the United States because "[t]he fact that Model chose to submit 35 false claims instead of some other number was, so far as United was concerned, wholly irrelevant completely fortuitous and beyond United's knowledge and control." *Bornstein*, 423 U.S. at 312, 96 S.Ct. 523.[6]

In *Bornstein*, the Court imposed penalties on the false invoices sent by United, not on all of the false tube markings and false packing lists created by United in furtherance of its fraud. In *Hess* the Court also refused to impose penalties for all of the false records the ECAP submitted in furtherance of its fraudulent and collusive bidding scheme, holding instead that a penalty should be imposed against each false bid submitted and accepted by the United States. The undersigned finds that the acts by KII in this case which most closely resemble the acts generating penalties in *Marcus* and *Bornstein* are the creation of false MMS–2014's, Osage Royalty Reports and monthly check stubs, and not the creation of all of the false records (e.g., run tickets, tank tables, and meter correction factors) which might have been created in furtherance of KII's alleged fraud.

### 2. Tenth Circuit Precedent— *Fleming v. United States*

Don Fleming operated a feed mill in New Mexico and he was a certified dealer under the Emergency Feed Program administered by the Commodity Credit Corporation, an agency of the federal government. Farmers eligible under the Emergency Feed Program received a

---

**6.** The three-justice dissent, written by Justice Rehnquist, would have remanded and would have permitted the imposition of 35 penalties upon a showing by the United States that

United could have foreseen the number or magnitude of claims which Model would ultimately submit to the government. *Id.* at 323, 96 S.Ct. 523.

Farmers Purchase Order ("FPO") for a specified amount of designated surplus feed. Farmers were entitled to take these FPO's and transfer them to a dealer like Fleming as partial payment for surplus feed. Dealers like Fleming were authorized to submit the FPO's to the government in exchange for a Dealers Certificate with a face value equal to the value of the FPO's. Dealers could then use the Dealers Certificates to purchase surplus feed from the government. Before a dealer could exchange an FPO for a Dealers Certificate, he was required to sign a certificate on the FPO, certifying that (1) he sold and actually delivered the designated surplus feed to the named farmer, and (2) that he accepted the FPO as partial payment for surplus feed. *Fleming v. United States*, 336 F.2d 475, 477 (10th Cir.1964).

The evidence at trial established that on 15 occasions, Fleming accepted an FPO from a farmer, gave the farmer a credit on his books, but did not in fact deliver any surplus grain to the farmer. Rather, the farmer would use the credit on Fleming's books at a later date to purchase non-surplus grains offered for sale at Fleming's mill. The evidence also established that Fleming created invoices and attached those invoices to the FPO's, falsely reflecting that the farmer had received a quantity of surplus grain. Fleming then executed the certificates on the FPO's, falsely certifying that he had actually delivered surplus feed to the farmer. Fleming redeemed the 15 FPO's for Dealers Certificates and then exchanged the Dealers Certificates for government surplus grain. *Fleming*, 336 F.2d at 477–78.

The trial court found that Fleming's actions were a violation of the FCA. The trial court then imposed 15 penalties—one for each FPO submitted by Fleming. The Tenth Circuit affirmed the trial court's award of penalties. Neither the trial court nor the Tenth Circuit imposed additional penalties for the false invoices attached by Fleming to support the false certifications

in the FPO's. *Fleming*, 336 F.2d at 480. Consistent with the Tenth Circuit's approach in *Fleming*, the undersigned finds that penalties should not be imposed on the run tickets, tank tables and meter correction calculations at issue in this case because, like the invoices in *Fleming*, those records are used only to support the allegedly false statements made in the MMS–2014's, Osage Royalty Reports and monthly check stubs.

### 3. Decisions From Other Courts of Appeal

#### a. *United States v. Rohleder*

In *Rohleder* the United States Navy entered into a contract with Cramp Shipbuilding Company ("Cramp") for the construction of six light cruisers. Before Cramp could begin construction, the contract required Cramp to make $12,000,000 in improvements to its shipyards. Cramp entered into 16 fixed-fee-plus-cost subcontracts with Charles Rohleder to make the improvements to Cramp's shipyards. Cramp's contract with the Navy required Navy approval for orders of material over a certain price. Consequently, all of Cramp's subcontracts with Rohleder also required approval from Cramp for orders of materials over a certain price. The Navy would not approve an order of materials unless it was accompanied by three or more bids. *United States v. Rohleder*, 157 F.2d 126, 127–28 (3rd Cir.1946).

The trial court found that under the 16 contracts, Rohleder submitted 90 purchase orders that contained one or more fraudulent bids. Rohleder would obtain bids from dealers which were higher than the bid Rohleder ultimately wanted the Navy to accept, with the dealer understanding that the bid the dealer was making would never be accepted. Rohleder was paid by Cramp on the 90 purchase orders, and Cramp was ultimately reimbursed by the Navy when Cramp submitted its Final Cost Certificate to the Navy. The trial court imposed 16 penalties—one for each of the 16 subcontracts under

which Rohleder had submitted false bids. The United States appealed, arguing that 90 penalties should be imposed—one for each purchase order under which Rohleder had submitted false bids. *Rohleder,* 157 F.2d at 128 and 130.

The Third Circuit rejected the United States' argument and affirmed the trial court, holding that

> [t]he fraud was committed with respect to the contracts. The purchase orders were part of those contracts and not definite projects in themselves. They are analogous to the great number of spurious forms in the Hess case which were absorbed into their respective projects. The grouping by the Trial Judge of the ninety purchase orders under their respective contracts generally corresponds to the distinctions made in [*Marcus v. Hess* ]. It is reasonable and has a sound basis in the record.

*Id.* at 131. Consistent with the Third Circuit's holding, the undersigned finds that in this case the grouping of many run tickets, tank tables, and meter correction factors under their respective MMS–2014, Osage Royalty Report or monthly check stub generally corresponds to the Supreme Court's holding in *Marcus,* is reasonable, and has a sound basis in the record.

### b. *United States v. Grannis*

In *Grannis,* the Fourth Circuit reached a substantially similar result as that reached by the Third Circuit in *Rohleder.* Edward Grannis and others entered into a fixed-fee-plus-cost contract with the United States to build an antiaircraft firing center known as Camp Davis. The "cost" portion of the contract included a rental fee paid to Grannis for use of equipment he owned and reimbursement for any equipment Grannis rented. *United States v. Grannis,* 172 F.2d 507, 508 (4th Cir. 1949).

For equipment owned by Grannis, once the United States' rental payments on a particular piece of equipment equaled the fair value of the equipment plus 1% for each month the equipment was in use, no more rental payments would be due and title to the equipment would vest in the United States. The "fair value" of the equipment **owned** by Grannis was based on Grannis' **actual cost** for the equipment. The equipment rented by Grannis, was to be covered by a rental contract between Grannis and the third party that permitted the United States to obtain title to the equipment in the same manner as was provided with regard to equipment owned by Grannis. However, the "fair value" for equipment ·**rented** by Grannis from third parties was based on **market value,** not actual cost. Thus, the third party did not have to account for any discounts or rebates he might have received when the equipment was originally purchased. *Grannis,* 172 F.2d at 508–509.

Grannis purchased 130 Ford cars and trucks with his own money and he was given discounts and rebates on the cars because he was considered a fleet owner and purchaser of Ford automobiles. Grannis had title to the cars and trucks placed in the name of William Jones, Grannis' brother-in-law. Grannis then immediately rented the cars and trucks from Jones for use on the Camp Davis project. In this manner, Grannis was able to retain the rebates and discounts he received because he listed the cars and trucks on the United States' rental schedules as rented equipment and not equipment which he owned. Grannis then submitted 10 vouchers to the United States for reimbursement of the rentals on the cars and trucks. *Grannis,* 172 F.2d at 509–10.

On appeal, Grannis' actions were found to be a violation of the FCA. The appellate court then had to determine the number of penalties that should be imposed against Grannis. The United States argued that it was entitled to recover a penalty for each act by Grannis that was prohibited by § 3729's predecessor—Rev.Stat. § 3490, 31 U.S.C. § 231.

These acts, the government says, include not only each of the ten vouchers covering the fictitious claims for the Jones rental presented to the United States, but also 130 additional violations consisting of the schedules attached to the vouchers for each of the 130 cars and trucks which contained false statements as to the ownership and valuation of the vehicles, that is to say, the government claims the sum of $280,000 for 140 violations at $2,000 each.

*Grannis,* 172 F.2d at 515. Relying on *Marcus* and *Rohleder,* the Fourth Circuit rejected the United States' argument. The Court held Grannis liable for only 10 penalties, finding that the 130 false schedules were subsumed within the 10 false vouchers. *Id.* at 515–16. Consistent with the Fourth Circuit's holding, the undersigned finds that in this case the run tickets, tank tables and meter correction factors, like the 130 false schedules in *Grannis,* are subsumed within their respective MMS–2014, Osage Royalty Report or monthly check stub.[7]

### c. *Miller v. United States*

After hurricane Camille destroyed nearly 100% of all homes in Placquemines Parish, Louisiana, the Department of Housing and Urban Development ("HUD") began a program to provide parish residents with temporary housing by setting up approximately 1,800 HUD-leased mobile homes. HUD then contracted with the Miller brothers to repair and provide preventative maintenance on the mobile homes. The Miller brothers submitted five consolidated billings to HUD—one for each month that work was performed under the contract before HUD became suspicious. Attached to these five consolidated billing were 11 invoices for work performed. *Miller v. United States,* 213 Ct.Cl. 59, 550 F.2d 17, 19–22 (1977).

A review of the monthly billings and attached invoices demonstrated that the Miller brothers were defrauding HUD by (1) charging for items not used to repair a mobile home, (2) charging more for items actually used to repair a mobile home than the item actually cost, and (3) charging for repairs that were never in fact made. The trial court found that the Miller brothers' actions were a violation of the FCA. On appeal, the issue was how to determine the number of penalties to be imposed. HUD argued that sixteen penalties should be imposed—five for the false monthly, consolidated billings and 11 for the false invoices attached to the monthly billings. *Miller,* 550 F.2d at 20–21.

The Court of Claims rejected HUD's argument and imposed five penalties—one for each monthly billing. The Court held that

> [t]he invoices for which [HUD] also seeks the statutory penalty were used in determining the total of each claim. In this regard, the invoices are like tally sheets used in calculating a final figure to present to the Government; they are not the claim itself.

> . . . .

7. *See also United States v. National Wholesalers,* 236 F.2d 944, 950 (9th Cir.1956) (holding the defendant liable for 10 penalties where 10 false vouchers had been submitted with 17 false invoices attached. The Court opted for the smaller number finding that a "loose count of false claims should not be made" because "[t]he civil Penalty provided [in the FCA] is inexact."); *United States v. Woodbury,* 359 F.2d 370, 378 (9th Cir.1966) (imposing penalties for the number of false applications for payment, not including the number of false documents contained in or attached to the application); *United States v. Cooperative Grain and Supply Co.,* 476 F.2d 47, 64 (8th Cir.1973) (holding that a false loan application can support only one penalty regardless of how many "false representations were made in different documents submitted to the Government"); and *United States v. Hibbs,* 420 F.Supp. 1365, 1370–71 (E.D.Pa.1976) *vacated on other grounds by* 568 F.2d 347 (3rd Cir.1977) (holding that a default on a government-insured mortgage and a demand for payment can only support one penalty regardless of how many false records were submitted to induce the government to issue mortgage insurance in the first place).

[HUD's argument is] more in line with Justice Rehnquist's dissent in *Bornstein* than with the majority opinion. It is the position of the dissent (and [HUD] in the instant case) that, based upon the facts of a particular case, each false item used in reaching a final figure which is then submitted for payment could be a violation of the Act. We reject this reasoning.

*Miller*, 550 F.2d at 24. Consistent with the Court of Claims' holding, the undersigned finds that, given the facts of this case, run tickets, meter correction factors and tank tables are also like tally sheets in that they are used to calculate a final figure which is ultimately reflected on an MMS–2014, Osage Royalty Report or monthly check stub.

The Court in *Miller* also held that the Miller brothers would be subjected to double punishment if penalties were imposed for the eleven invoices and the five consolidated billings. The Court found that the FCA never intended this form of double punishment. *Miller*, 550 F.2d at 23, n. 11. Plaintiffs recognize that the type of double punishment identified by the Court in *Miller* would occur in this case if a penalty were imposed on both the MMS–2014's, Osage Royalty Reports or monthly check stubs and on the run tickets, tank tables and meter correction factors used to calculate the figures reflected on the MMS–2014's, Osage Royalty Reports and monthly check stubs. *See* Doc. No. 211, pp. 12 and 14. Plaintiffs offer to solve this double punishment problem by accepting penalties only for the false run tickets, tank tables and meter correction factors and refusing penalties for the false MMS–2014's, Osage Royalty Reports and monthly check stubs.

Plaintiffs choose the run ticket, tank table and meter correction factor over the MMS–2014, Osage Royalty Report and monthly check stub because Plaintiffs argue, consistent with the Supreme Court's decision in *Bornstein*, that the FCA imposes liability "only for each 'act,' not the number of false documents created as a result of the act." Doc. No. 212, p. 14. Plaintiffs argue that given the facts of this case, the violative act for purposes of the FCA is the creation of a false run ticket, tank table or meter correction factor. Plaintiffs argue that the creation of a false MMS–2014, Osage Royalty Report or monthly check stub cannot be the violative act under the FCA because these documents are "downstream" accounting documents whose creation and use are caused by the original act of falsifying the run tickets, tank tables and meter correction factors.

The rule employed by Plaintiffs to determine which act to penalize to prevent double punishment is really a "first act" rule. In others words, Plaintiffs argue that the first false record should be penalized and then no other records which incorporate or make use of the information in the first false record should be penalized. Plaintiffs have, however, offered no reason based in either the language or the legislative history of the FCA why it is that the first act, rather than the last act, should be penalized. Plaintiffs' argument is also inconsistent with the all of the cases discussed above, where the last act was penalized. The undersigned finds that given the facts of this case it makes more sense to penalize the last act—the creation of false MMS–2014's, Osage Royalty Reports and monthly check stubs.

The MMS–2014's, Osage Royalty Reports and monthly check stubs represent the one instance in which all information comes together and KII calculates and reports a final volume of oil and a final price for that oil. Run tickets, tank tables and meter correction factors are subject to modification up until an MMS–2014, Osage Royalty Report or monthly check stub is prepared and submitted to the DOI or a lessee. The run tickets, tank tables and meter correction factors are, therefore, subsumed within their respective MMS–2014's, Osage Royalty Reports and monthly check stubs. The MMS–2014's, Osage

Royalty Reports and monthly check stubs represent KII's final statement regarding the amount of oil purchased from a particular lease and the amount of money KII will pay for that oil. Thus, it is not until KII has created a false MMS-2014, Osage Royalty Report or monthly check stub that it has definitively committed its corporate self to paying for less oil than it actually took from a particular lease.

#### d. *United States v. Krizek*

The United States filed an FCA action against Dr. George Krizek, a psychiatrist. For services provided to Medicare and Medicaid recipients, Dr. Krizek sought reimbursement from the government by filing a form HCFA 1500. The HCFA 1500 contains a section where each procedure performed on the patient is to be identified by using a five-digit code found in the American Medical Association's Current Procedures Terminology Manual (CPT codes).[8] An HCFA 1500 lists those services provided to a single patient, and it may include many CPT codes if the patient has been treated over a period of time. *United States v. Krizek*, 111 F.3d 934, 935–36 (D.C.Cir.1997).

The government established at trial that Dr. Krizek had performed and billed for services which were not medically necessary, and that Dr. Krizek "upcoded" several procedures by using a CPT code for more extensive treatments than were actually rendered (e.g., by using CPT code 90844 when CPT code 90843 was appropriate). The district court imposed 11 penalties against Dr. Krizek—one for each CPT code the government was ultimately able to show as false. Dr. Krizek appealed, arguing that penalties should be imposed based on the number of false HCFA 1500's, and not the number of false CPT codes on the various HCFA 1500's. The District of Columbia Circuit agreed with Dr. Krizek, and relying on each of the authorities discussed above, held that

whether one penalty or many should be imposed is a fact-based inquiry that must be made by focusing on the specific conduct of the defendant. Focusing on the definition of "claim" in § 3729(c) and Dr. Krizek's conduct, the Court held that the number of penalties should be tied to the number of requests or demands for payment made by Dr. Krizek. The Court held further that the HCFA 1500, and not the CPT codes recorded on the HCFA 1500, were requests or demands for payment. The Court viewed the CPT codes as nothing more than invoices used to explain how Dr. Krizek computed the amount requested or demanded on a particular HCFA 1500. *Krizek*, 111 F.3d at 938–940.

The undersigned finds that the run tickets, tank tables and meter correction factors at issue in this case are closely analogous to the CPT codes at issue in *Krizek*. The run tickets, tank tables and meter correction factors relevant to a particular lease are used, like the CPT codes in *Krizek*, to compute the amount reported as owing on a particular MMS-2014, Osage Royalty Report or monthly check stub. The run tickets, tank tables and meter correction calculations are simply supporting documentation. No court has imposed penalties for this type of supporting documentation, especially when the supporting documentation, as it is here, is subject to revision and correction until the moment an MMS-2014, Osage Royalty Report or monthly check stub is submitted to a lessee or the DOI.

#### 4. Plaintiffs' Attempt to Distinguish The Cases Discussed Above

Section 3729(a)(1), the affirmative false claim provision of the FCA, imposes liability for "presenting" or causing to be presented a false "claim" for payment. Section 3729(a)(7), the reverse false claim provision of the FCA, imposes liability for

---

8. For example, the manual notes that CPT code 90844 is to be used to indicate a medical psychotherapy session lasting 45–50 minutes, whereas CPT code 90843 indicates a medical psychotherapy session lasting 20–30 minutes.

"making or using" or causing to be made or used a "false record or statement" to conceal, avoid or decrease an obligation to pay or transmit money to the United States. The bad act under (a)(1) is the presenting of a false claim. The bad act under (a)(7) is the making or using of a false statement or record. There is no "presentment" language in § 3729(a)(7). Plaintiffs argue that all of the cases discussed above can be distinguished on this basis alone.

Plaintiffs argue that all of the cases discussed above are affirmative false claim cases, and that all of the courts' decisions can be distinguished because those courts were focusing on finding a record that was "presented" to the government and not on the reverse false claim situation which only requires the creation or use of a false record.[9] The gist of Plaintiffs' argument is that had the court's in the cases discussed above been focusing on the "creation" of false records rather than the "presentment" of false records, they would have reached different results given the facts of each case. The undersigned does not agree.

In all of the cases discussed above, there were multiple false records which were actually presented to the government, but the courts chose not to impose penalties for all of the records presented.[10] The courts' focus was, therefore, not entirely on whether the false record in question was or was not presented to the government. Other factors, including concerns about double punishment, and a functional evaluation of the conduct involved in each

of those cases, necessarily accounts for the decisions reached.

Plaintiffs' attempt to distinguish the cases discussed above appears to be premised on the conclusion that the creation and use, rather than the presentation, of a false record is only punishable in reverse false claims cases, where the false record is used to conceal or decrease an obligation to pay the government. Plaintiffs ignore the fact that even in an affirmative false claims case, like those discussed above, the FCA has always proscribed the creation or use of a false record to get a claim paid by the government. *See* 31 U.S.C. § 3729(a)(2); and Rev.Stat. §§ 3490–93 and 5438 (March 2, 1863 and as amended on December 23, 1943). Thus, in each of the cases discussed above, the court could have penalized all of the false records at issue in those cases merely because they had been created or used to get a false claim paid. The fact that they did not do so suggests that a wooden count of the number of false records is not an appropriate application of the FCA in either an affirmative or reverse false claims case. *See Rohleder*, 157 F.2d at 131 (specifically rejecting the argument that the district court's holding was incorrect because the district court had ignored language similar to that in § 3729(a)(2) and (a)(7)). Furthermore, Plaintiffs themselves admit that to the extent imposing a penalty on every false record would cause double punishment, not every false record will generate a penalty.

The authorities discussed above demonstrate that in FCA cases, courts must take a pragmatic view of the transactions in-

---

**9.** The parties have not cited and the undersigned has not found any reverse false claims cases where the issue of how to determine the number of penalties has been addressed.

**10.** *See Marcus*, 317 U.S. at 552, 63 S.Ct. 379 (refusing to penalize every form presented to the government in furtherance of defendants' fraudulent bidding scheme); *Bornstein*, 423 U.S. at 312, 96 S.Ct. 523 (refusing to penalize the false packing lists even though they were presented to Model); *Fleming*, 336 F.2d at 480 (refusing to penalize the false invoices

attached to the FPO's even though they were presented to the government); *Rohleder*, 157 F.2d at 130–31 (refusing to penalize the false purchase orders and false bids even though they were presented to the government); *Grannis*, 172 F.2d at 515 (refusing to penalize the false schedules attached to the vouchers even though they were submitted to the government); and *Miller*, 550 F.2d at 24 (refusing to penalize the invoices even though they were presented to the government).

volved to determine how each allegedly false record is being used. In this case, the undersigned finds that if Plaintiffs can prove the allegations in their Second Amended Complaint, KII's creation of false run tickets, tank tables and meter correction factors were all a means to an end—the creation of false MMS–2014's, Osage Royalty Reports and monthly check stubs. It was these reports and check stubs that KII ultimately used in an attempt to reduce its obligation to pay for oil taken from federal and Indian leases, and it is KII's use of these reports and check stubs that should be penalized under the FCA.

If the Court were to distinguish the affirmative false claims cases discussed above on the ground offered by Plaintiffs, the Court would be creating one rule for affirmative false claims and one rule for reverse false claims. Such a result would be clearly contrary to the FCA's legislative history.

Congress amended the FCA in 1986 and added § 3729(a)(7) to make it explicitly clear that it intended the FCA to impose liability against those who fraudulently attempt to reduce an obligation they owe to the government (i.e., reverse false claims). The Senate report in support of the 1986 amendments states that § 3729(a)(7) was added to make it clear that "an individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the Act *as if he had submitted a false claim to receive money.*" S.Rep. 345, 99th Cong., 2d Sess., p. 18, reprinted in 1986 U.S.C.C.A.N. 5266 (July 28, 1986) (emphasis added). The House of Representatives also stated that "there is no reason to treat a false claim filed against the Government to fraudulently reduce an obligation owed to the Government differently from one filed for the purpose of fraudulently obtaining money." H.Rep. 660, 99th Cong., 2d Sess., p. 20. It is clear, therefore, that Congress did not intend for affirmative and reverse false claims to be treated differently. Thus, the holdings in the affirmative false claims cases discussed above are equally applicable to reverse false claims cases like this one.

### 5. KII's Eighth Amendment Argument

KII argues that if the Court were to accept Plaintiffs' argument and impose a penalty for each allegedly false run ticket, tank table and meter correction factor, the resulting penalty would violate the excessive fines clause of the Eighth Amendment to the United States Constitution. The undersigned finds that it is premature to consider the Eighth Amendment at this stage of the litigation.

First, KII has not definitively established that the Eight Amendment's excessive fines clause would apply to civil penalties imposed by the FCA. Second, the "excessiveness" of a penalty must be assessed in light of the actual damages involved and in light of the defendant's overall culpability. *See BMW v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). This type of analysis cannot be conducted on the record presently before the Court. Third, the undersigned finds that a statute should not be interpreted initially in light of the Eight Amendment. Rather, a penalty statute should be interpreted in light of its language, legislative history, and purpose. The penalty statute, as interpreted, should then be applied to a particular factual setting. If the statute, as interpreted and applied to a particular set of facts, produces an unconstitutionally excessive fine, the amount of the penalty can then be remitted to prevent an unconstitutional result. Thus, the excessive fines clause has not been considered in formulating the findings and recommendations expressed in this Report and Recommendation.

**B. A PENALTY SHOULD BE IMPOSED FOR EACH LEASE ON AN MMS–2014, OSAGE ROYALTY REPORT OR MONTHLY CHECK STUB WHEN KII REPORTED AND PAID FOR LESS OIL THAN IT ACTUALLY TOOK FROM THAT LEASE DURING THE PREVIOUS MONTH.**

Plaintiffs argue that if the MMS–2014's, Osage Royalty Reports and monthly check

stubs are the records used to determine how many penalties to impose in this case, then a penalty should be imposed for each line item on the MMS–2014, Osage Royalty Report and monthly check stub. KII argues that a penalty for each line item is not appropriate and that a single penalty should be imposed for each MMS–2014, Osage Royalty Report and monthly check stub. The undersigned agrees with neither of these positions.

An examination of the MMS–2014, as an example, demonstrates why a penalty should not be imposed for each line item on the report. The MMS–2014's contain a line item for every federal and non-Osage Indian lease from which KII purchases oil, regardless of whether any oil was actually purchased during the period for which the report is being prepared. Thus, several line items reflect no purchases at all. A penalty cannot be imposed for these line items.

Plaintiffs' argument is premised on its belief that each line item on an MMS–2014 represents a separate obligation to pay money to the DOI or a lessee under a separate lease agreement with the United States. However, the uncontroverted facts establish that the line items on an MMS–2014 do not correspond directly with leases or separate transactions. More than one line can relate to a single lease and a single transaction because (a) the MMS may have assigned two separate accounting identification numbers to a particular lease, generating multiple line items for each accounting number; (b) multiple line items may be used to represent separate products from and separate selling arrangements in connection with the same lease, and (c) several line items might represent a correction to a line item on a prior month's report. These facts preclude the imposition of a penalty for each line item. KII's obligation to pay for oil taken from a particular lease is divided into several line items by the intricacies of government reporting regulations, not by any affirmative conduct of KII.

Relying primarily on *Krizek*, KII argues that only a single penalty can be imposed in connection with an MMS–2014, Osage Royalty Report or monthly check stub. The undersigned finds *Krizek* distinguishable. In *Krizek*, Dr. Krizek submitted an HCFA 1500, seeking reimbursement for services provided to recipients of Medicare and Medicaid. An HCFA 1500 relates to a single patient and it contains up to six CPT codes, identifying the procedures performed on the patient. The D.C. Circuit imposed one penalty for each HCFA 1500, refusing to impose a penalty for each false CPT code on the form. *Krizek*, 111 F.3d at 938–40. KII argues that the line items on the MMS–2014's, Osage Royalty Reports and monthly check stubs are the same as the CPT codes on the HCFA 1500 at issue in *Krizek*. The undersigned does not agree.

The HCFA 1500 is not functionally equivalent to an MMS–2014, Osage Royalty Report or monthly check stub. In *Krizek* the obligation at issue related to a specific patient, and in this case, the obligation at issue relates to a specific mineral lease. The HCFA 1500 reports transactions for one patient, thus it made sense for the Court to impose one penalty. The MMS–2014, Osage Royalty Report and monthly check stub report transactions for many distinct mineral leases. Given the facts of this case, the CPT codes are the functional equivalent of the run ticket, not the MMS–2014 line items. The D.C. Circuit held that the CPT codes are like invoices which are tallied to determine the amount due for a particular patient. In this case, the run tickets are also like invoices, which are tallied to determine the amount owing for a particular lease. Furthermore, it is the payment of less of a royalty than that which is owed on a given mineral lease which generates liability in this case. Thus, the undersigned finds *Krizek* to be distinguishable from this case on its facts.

Maintaining a functional view of the transactions at issue in this case, the un-

dersigned finds that for each MMS–2014, Osage Royalty Report and monthly check stub, all of the line items relating to a particular lease must be viewed together to determine the net effect of KII's purchases from that lease during the prior month. The basic violation alleged by Plaintiffs in this case is that KII received delivery of oil from a particular lease over the course of a month and then paid for less oil than it actually took during that month. Thus, if Plaintiffs can demonstrate, after viewing all of the line items relating to a particular lease together, that KII reported and paid for less oil than it actually took from that lease during the previous month, then a penalty should be imposed in connection with that lease.

## IV. KII CAN BE LIABLE UNDER THE FCA IN CONNECTION WITH ITS PURCHASES FROM 100% DIVISION ORDER LEASES.

### A. THE FCA IMPOSES LIABILITY FOR INDIRECT REVERSE FALSE CLAIMS

KII concedes, as it must, that the FCA imposes liability when a false record made by one causes another to submit a false claim to the government in attempt to get the government to part with money or property. KII refers to these types of claims as indirect false claims. The classic example of an indirect false claim is when a subcontractor prepares a false record which causes a government prime contractor to submit a false request for reimbursement to the government. *See, e.g.,* *Tanner v. United States,* 483 U.S. 107, 129, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (holding that "the fact that a false claim passes through the hands of a third party on its way from the claimant to the United States does not release the claimant from culpability under the Act."); *Marcus,* 317

U.S. at 541–45, 63 S.Ct. 379; *Bornstein,* 423 U.S. at 309–13, 96 S.Ct. 523; and *Smith,* 287 F.2d at 304. *See also* 31 U.S.C. §§ 3729(a)(1) and (c).

If purchases from the 100% division order leases at issue in this case involve false claims under the Act, they are indirect reverse false claims. Given Plaintiffs' allegations, the 100% division order leases involve indirect reverse false claims because KII attempted to reduce its obligation to pay money by causing the lessees on 100% division order leases to submit a false record (i.e., an MMS–2014 or Osage Royalty Report) to the DOI. KII allegedly caused the lessee to submit a false record to the DOI by submitting false monthly accountings (i.e., check stubs) to the lessees.

KII argues that it cannot be held liable under the FCA in connection with any of its purchases from 100% division order leases. KII argues that, while the FCA imposes liability for indirect false claims, it does not impose liability for indirect *reverse* false claims. Specifically, KII argues that Congress did not intend for the FCA to apply to indirect reverse false claims, and that nothing in the FCA creates liability for an indirect attempt to reduce an obligation to pay money to the government. As support for its argument, KII relies primarily on Congress' 1986 amendment of the FCA.

In 1986, Congress amended the FCA and added § 3729(a)(7) and § 3729(c). Congress added subsection (a)(7) to make it clear that the FCA imposed liability for reverse false claims.[11] Congress added subsection (c) to more specifically define "claim." Specifically, Congress added subsection (c) to make it clear that the FCA imposed liability for indirect false claims

---

**11.** Section 3729(a)(7) provides as follows:

> *Any person who knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government* is liable to the United States Government for a civil penal-

ty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

31 U.S.C. § 3729(a)(7) (emphasized language added by Congress in 1986).

so long as government funds were involved. Subsection (c) provides as follows:

> Claim Defined.—For purposes of this section, "claim" *includes* any request or demand whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (emphasis added).

KII argues that because subsections (a)(7) and (c) were added at the same time, the absence of any reverse false claim language in subsection (c) conclusively demonstrates that Congress did not intend the FCA to impose liability for indirect reverse false claims. In other words, KII argues that the FCA imposes liability for causing another to submit a false record in an attempt to get money from the government, but the FCA does not impose liability for causing another to submit a false record in an attempt to reduce an obligation to pay money to the government. The undersigned finds that KII's argument is not supported be either the language of the FCA or the FCA's legislative history.

KII's argument appears to be based in part on its belief that subsection (c) contains a definitive definition of "claim." However, subsection (c) is not an attempt to exhaustively define "claim." Rather subsection (c) provides one example of what can constitute a claim under the FCA. This is confirmed by the fact that Congress used the word "includes" in subsection (c). Congress said that for purposes of the FCA, the term "claim" includes the circumstances listed in subsection (c). With this language, Congress obviously left the definition of "claim" open to interpretation by the courts.

Interpreting subsection (c) as leaving the development of the definition of claim to the courts is confirmed by the legislative history of the 1986 amendments to the FCA. Congress added subsection (c) to accomplish one purpose—"to overrule *[United States v.] Azzarelli* [, 647 F.2d 757 (7th Cir.1981) ] and similar cases which [had] limited the ability of the United States to use the act to reach fraud perpetrated in federal grantees, contractors or other recipients of Federal funds." S.Rep. 345, 99th Cong., 2d Sess., p. 22, reprinted in 1986 U.S.C.C.A.N. 5266 (July 28, 1986). The legislative history from both houses of Congress recognizes that a claim may take many forms, but at bottom a claim is the creation or use of any false record which ultimately causes a loss to the government. *Id.* at 9–10 and 21–22; and H.Rep. 660, 99th Cong., 2d Sess., p. 21. Given the history and purpose of the Act, the undersigned finds that the term "claim" as used in the FCA also "includes" indirect reverse false claims like those at issue in this case. *See* Doc. Nos. 99 and 275 for a discussion of the FCA's history and purpose.

The legislative history of the FCA also establishes that Congress did not intend for affirmative and reverse false claims to be treated differently. As was discussed in section III(A)(4), *infra*, Congress intended for affirmative and reverse false claims to be treated the same. .S.Rep. 345, 99th Cong., 2d Sess., p. 18, reprinted in 1986 U.S.C.C.A.N. 5266 (July 28, 1986); and H.Rep. 660, 99th Cong., 2d Sess., p. 20. Recognizing liability under the FCA for indirect false claims, but not for indirect reverse false claims, would be contrary to this legislative intent.

**B. There Are Material Questions of Fact Regarding KII's Knowledge of the Existence of a Federal or Indian Royalty Interest On The 100% Division Order Leases From Which It Purchased Oil.**

There is no direct contractual or other relationship between KII and the govern-

ment in connection with the 100% division order leases from which KII purchases oil. Consequently, KII argues that it cannot be held liable under the FCA in connection with its purchases from 100% division order leases because KII does not know that a federal or Indian royalty interest is present on the lease. Plaintiffs argue that summary judgment on this issue is precluded by genuine issues of material fact regarding KII's knowledge, as that term is defined in § 3729(b). To the extent that the FCA requires knowledge by KII that the obligation it is reducing is federal in nature, the undersigned agrees with Plaintiffs that material questions of fact exist regarding KII's "knowledge."

The FCA defines "knowing" and "knowingly" as follows:

[T]he terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

Plaintiffs allege that applying the three prongs of § 3729(b), a jury could find that KII knew that a federal or Indian lease was involved on many of the 100% division order leases from which KII purchased oil. There is some evidence to suggest that the names of several of the 100% division order leases contain some indication that they are federal or Indian leases. There is also some evidence that a sign or other marking physically present at the lease would identify the lease as a federal or Indian lease at the time oil was actually purchased. There is also evidence demonstrating that KII required the lessees from which it purchased to complete a form titled Purchase and Connection Acknowl-

edgment and Federal Lease Notification, and that these forms would alert KII that a federal interest was on the lease. There is also evidence that the operators of federal and Indian leases and the Bureau of Land Management would occasionally send materials to KII which would identify a particular lease as a federal or Indian lease. There are, therefore, material questions of fact regarding KII's actual knowledge.

Plaintiffs also argue that in connection with certain 100% division order leases, if KII did not know the lease had a federal or Indian royalty interest, KII did not know that fact because it was deliberately ignorant of that fact. As an example, Plaintiffs point to any 100% division order lease which might exist in Osage County, Oklahoma, where virtually all leases would have an Indian royalty interest. Plaintiffs also argue that because KII operates an oil business in the mid-continent region of the United States, where a significant number of leases are subject to federal and Indian royalty interests, KII's lack of knowledge of those interests is due to KII's reckless disregard of the facts. Again, the undersigned finds that these issues present genuine questions of material fact regarding KII's knowledge of federal and Indian royalty interests on the 100% division order leases from which it purchased oil during the relevant period covered by this lawsuit.

## V. DOES RECORDING A VALUE ON A RUN TICKET OTHER THAN THE VALUE WHICH WAS ACTUALLY OBSERVED BY A GAUGER MAKE THE RUN TICKET *PER SE* FALSE?

When a KII gauger purchases oil, he completes a run ticket by taking various physical measurements (e.g., top gauge, bottom gauge, etc.) and recording them on the run ticket. KII admits that its gaugers often record a measurement on the run ticket that is different that the measurement actually taken by the gauger. For example, a gauger may measure a top

gauge of 11′6″, and record a value of 11′2″ on the run ticket. KII argues that measurements other than those actually observed by the gauger are recorded on run tickets to account for various field conditions, such as encrustation on the walls of a tank, sediment in the bottom of a tank (i.e., high bottoms), green oil (i.e., oil with a large amount of air due to the fact that it has recently been run into the tank), and others. KII does not, however, indicate on the run ticket either that an adjustment has been made or the cause for the adjustment.

The FCA imposes liability for creating or using false records. The FCA does not, however, define when a record is false. The determination of what is false is generally left to the good sense of the jury. The parties have asked the Court to determine whether the jury in this case may be permitted to find that a run ticket is *per se* false if a gauger records a value (e.g., top gauge, bottom gauge, etc.) on the run ticket other than the value which was actually observed by the gauger when he gauged the oil, regardless of whether a field condition might justify an adjustment to the measurement actually observed by the gauger. Plaintiffs argue that the run tickets are *per se* false when anything other than an actual/unadjusted measurement is recorded because such unilateral adjustments to a run ticket are not permitted by applicable gauging regulations, standards or customs. KII argues that if a legitimate field condition justifies the adjustment, the run ticket cannot be false because the adjusted ticket accurately reflects the amount of oil purchased by KII.

The undersigned will not issue a recommendation on this issue at this time. Plaintiffs' motion for summary judgment was necessarily focused on the run ticket because Plaintiffs were arguing that penalties should be imposed in this case based on the number of false run tickets created or used by KII. Plaintiffs' position necessarily required them to seek a ruling regarding the falsity of the run tickets at issue in this case. The undersigned has recommended that penalties not be determined in this case based on the number of false run tickets. That ruling may impact Plaintiffs' position of the run ticket falsity issue.

The undersigned has also determined that, if Plaintiffs wish to pursue the falsity issue, additional briefing is necessary. On the same date this Report and Recommendation was filed, the undersigned also filed an Order directing additional briefing on this issue. KII currently has a motion for summary judgment directed to the issue of how Plaintiffs will be required to prove liability and damages in this case. *See* Doc. No. 331. That motion has been referred to the undersigned, and the undersigned will revisit the run ticket falsity issue when it considers that motion, and after additional briefing has been received.

### RECOMMENDATION

The undersigned recommends that Plaintiffs' motion and Defendants' motion for partial summary judgment be **GRANTED IN PART and DENIED IN PART**. [Doc. Nos. 211 and 219]. The undersigned finds that KII can be liable under the FCA in connection with its purchases from 100% division order leases, and that there are material questions of fact regarding KII's knowledge of the existence of a federal or Indian royalty interest on the 100% division order leases from which it purchased oil. The undersigned also recommends that, if liability under the FCA is established, a penalty of between $5,000 and $10,000 be assessed against KII for each lease on an MMS–2014, Osage Royalty Report or monthly check stub when KII reported and paid for less oil than it actually took from that lease during the previous month.

### OBJECTIONS

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or

whether to recommit the matter to the undersigned. As part of his/her review of the record, the District Judge will consider the parties' written objections to this Report and Recommendation. A party wishing to file objections to this Report and Recommendation must do so within ten days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court. *See Moore v. United States,* 950 F.2d 656 (10th Cir.1991); and *Talley v. Hesse,* 91 F.3d 1411, 1412–13 (10th Cir.1996).

January 27, 1999.